**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

THE UNITED STATES OF AMERICA,

               Plaintiff,

v.

THE CITY OF BOSTON; MICHELLE WU,
Mayor of the City of Boston, in her Official
Capacity; BOSTON POLICE DEPARTMENT;
MICHAEL A. COX, Police Commissioner, in
his Official Capacity,

               Defendants.

Civil Action No. 1:25-CV-12456-LTS

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

**INTRODUCTION**

Since 2014, the Boston Trust Act has been an important component of Boston's public safety strategy—a strategy that has made Boston the safest major city in the country.[1] The Trust Act requires the Boston Police Department to prioritize criminal law enforcement, while leaving civil immigration enforcement to federal officials. This structure is not, and could not be, in conflict with or preempted by the Immigration and Nationality Act—which creates a system for voluntary state and local cooperation with the federal government. Nor does the Trust Act regulate or discriminate against the federal government. Rather, the Trust Act is an exercise of Boston's authority protected by the Tenth Amendment.

Over a decade after the Trust Act's initial enactment, Boston is thriving. The City's commitment to community policing, partnerships with community leaders, and investments in the wellbeing of all its residents have produced historically low crime rates. Boston's neighborhoods are filled with vibrant local businesses, its universities are the envy of the world, and its hospitals are the best in the nation. The City has made record investments in education, affordable housing, and resilient infrastructure, all to make Boston a home for everyone. The City dedicates its efforts and resources to meeting its residents' everyday needs, and the success of its residents and institutions shows that the City's policies are working.

Yet, despite the clear success and legality of the Trust Act, the United States now seeks to override the Act by pressing Supremacy Clause claims it has brought—and, to date, lost— repeatedly against other jurisdictions. This Court should dispense with the Complaint, as has every other court to rule on similar claims.[2]

---

[1] *See, e.g.*, The Economist, *How Boston Became the Safest Big City in America*, Vol. 452 (Sept. 8, 2024), available at https://perma.cc/4GHD-6ZQS.

[2] *See United States v. Illinois*, No. 25-CV-1285, 2025 WL 2098688 (N.D. Ill. July 25, 2025); *United States v. New Jersey*, No. 20-1364, 2021 WL 252270 (D.N.J. Jan. 26, 2021); *McHenry Cnty. v. Raoul*, 574 F. Supp. 3d 571 (N.D.

## BACKGROUND

The Boston Trust Act[3] was enacted in 2014, and amended in 2019, to restrict the use of Boston's resources on civil immigration enforcement, instead preserving those resources for criminal law enforcement. Since its enactment, the Trust Act has served numerous critical public safety purposes in the City. First, the Act promotes public safety by fostering trust between residents and their government.[4] Boston is safer when residents, regardless of immigration status, know they can call the Boston Police Department to report crime, participate in the economy, and utilize City services—basic functions of civic life that promote the prosperity and stability on which public safety relies. Boston has built this trust through decades of community policing and cooperative work with local leaders. The Trust Act protects that success.

The Trust Act also assures that local resources are devoted to local priorities—most notably, criminal law enforcement. *See, e.g.*, Trust Act, §§ 1.9(D)(1)-(2); *see also* Compl. ¶¶ 32, 36 (describing Trust Act legislative history and collaboration between City and federal officials on criminal matters as furthering "the City of Boston's own criminal justice priorities," citing §§ 1.9(D)(2)-(3)). The Trust Act reflects the reality that devoting resources to civil immigration enforcement has costs, and it codifies Boston's focus on preventing crime.

Further, the Trust Act ensures that Boston complies with state law. The Massachusetts Supreme Judicial Court has held that state and local officials lack the authority to detain an

---

Ill. 2021) ("*McHenry Cnty. I*"), *aff'd*, 44 F.4th 581 (7th Cir. 2022) ("*McHenry Cnty. II*"); *Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 375 (D.N.J. 2020), *aff'd sub nom. Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of State of N.J.*, 8 F.4th 176 (3d Cir. 2021); *United States v. California*, 314 F. Supp. 3d 1077 (E.D. Cal. 2018) ("*California I*") (at preliminary injunction stage), *aff'd in relevant part*, 921 F.3d 865 (9th Cir. 2019) ("*California II*").

[3] The Boston Trust Act was codified in the City of Boston Code of Ordinances as Chapter 11, Section 1.9, available at https://perma.cc/6TQB-9NQP. Because sections are numbered differently in the Code than in the ordinance (attached to the Complaint as Exhibit 2), the City cites to the linked codified version as the "Trust Act."

[4] *See, e.g.*, Compl. ¶ 31, Ex. 1 at 1 ("When local law enforcement officials indiscriminately honor all ICE civil immigration detainer requests, including those that target non-criminal aliens, immigrant residents are less likely to cooperate and public trust erodes, hindering the ability and effectiveness of Boston's police force[.]").

individual based solely on a civil immigration detainer. *Lunn v. Commonwealth*, 477 Mass. 517, 519 (2017). The Trust Act implements that holding with respect to Boston Police Department officers and other City employees, ensuring that the City operates within the bounds of the law.

The Trust Act realizes these public safety goals through three provisions relevant here. First, § 1.9(B) provides that local law enforcement "shall not detain" individuals who are eligible for release "solely on the basis of a civil immigration detainer request or an . . . administrative warrant"—mechanisms by which the federal government can ask for the continued detention of an individual for civil immigration purposes. But the Act permits continued detention in response to a *criminal* warrant issued by a judge. Second, § 1.9(D)(1) prohibits use of City resources "to interrogate, detain or arrest persons for immigration enforcement purposes," including by asking an individual's immigration status, detaining an individual pursuant solely to a detainer request, providing "personal information" or release date and time for civil immigration enforcement purposes, making arrests pursuant to administrative warrants, transferring individuals to immigration officers' custody without a judicial warrant or order, or otherwise performing the duties of immigration officers. And third, §§ 1.9(D)(2)-(4) ensure that City resources are dedicated to criminal law enforcement. The Trust Act explicitly provides for, among other things: collaboration with federal officials on criminal matters; information sharing with federal officials on criminal matters; pursuit of criminal matters related to immigration offenses; enforcement of criminal firearms offenses related to immigration status; and certifications under the T and U Visa programs. *See* Trust Act, § 1.9(D)(2).

Through its Complaint, the United States now seeks to invalidate several of these important public safety provisions by asserting a distorted view of federal supremacy—specifically, by claiming that the Immigration and Naturalization Act preempts the Trust Act and that the Trust

Act improperly regulates and discriminates against the federal government. *See, e.g.*, Compl. ¶¶ 6, 8 (asserting preemption with respect to the detainer request, administrative warrant, and information provision portions of the Trust Act); ¶¶ 52-64 (claims). But those claims cannot withstand scrutiny, in no small part because the Complaint ignores what the Trust Act protects: the authority of Boston to determine the public safety policies that best meet its community's needs. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 398 (2012) ("Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect.").

## **LEGAL STANDARD**

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a court must "take the complaint's well-pled (*i.e.*, non-conclusory, non-speculative) facts as true," *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012), a court must "disregard[]" "legal conclusions couched as fact," *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (quotation marks omitted).

## **ARGUMENT**

The United States' claims fail. First, there is no conflict preemption here because the Immigration and Nationality Act ("INA") permits, but does not require, local participation in immigration enforcement, and the Trust Act merely declines that invitation; indeed, making such participation mandatory would violate the Tenth Amendment. Second, the INA does not expressly preempt the Trust Act. The Complaint relies on 8 U.S.C. §§ 1373 and 1644 to mount this claim, but the Trust Act itself permits compliance with those sections. Further, the United States'

expansive reading of those sections is unsupported by their text and would violate the Tenth Amendment. And, regardless, the sections cannot preempt the Trust Act as a matter of law because they do not regulate private actors. Third, the Trust Act does not discriminate against or regulate the federal government; it is a neutral policy that regulates only City, not federal, actors, and any incidental impact of the Act on the federal government is permitted by the Tenth Amendment. Finally, the Complaint fails to establish that Mayor Michelle Wu, Police Commissioner Michael Cox, and the Boston Police Department can properly be named as defendants. For these reasons, this Court should dismiss the Complaint with prejudice.

## I.    Federal Law Does Not Preempt the Trust Act

The Complaint suggests the Trust Act is preempted in two ways: that it obstructs certain provisions of the INA (conflict preemption), and that provisions in the INA governing the sharing of specified information override the information sharing provisions in the Trust Act (express preemption). *See* Compl. ¶¶ 53-54. But preemption is "'an extraordinary power in a federalist system,'" and courts "'must assume Congress does not exercise [it] lightly.'" *McHenry Cnty. II*, 44 F.4th at 587 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)). To prevail, a plaintiff must identify a specific basis for the claimed preemption; "[i]nvoking some brooding federal interest or appealing to a judicial policy preference should never be enough." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019); *accord Kansas v. Garcia*, 589 U.S. 191, 212 (2020) ("[T]he possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption."). Moreover, in cases such as this one, where a local public safety policy is at issue, "courts should assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." *Arizona*, 567 U.S. at 400 (quotation marks omitted); *see, e.g.*, *Metro. Life Ins. Co. v. Mass.*, 471 U.S. 724, 756 (1985) (defining police

powers to include legislation as "to the protection of the lives, limbs, health, comfort, and quiet of all persons"); *United States v. Morrison*, 529 U.S. 598, 617 (2000) (There is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").[5] The United States cannot meet this high bar, and Count I should be dismissed.

### A.  The Trust Act Does Not Pose an Obstacle to the INA

Conflict preemption occurs where state or local law "stands as an obstacle" to federal law. *Arizona*, 567 U.S. at 399-400. A "high threshold must be met"; the obstacle must be concrete, not merely in tension with statutory objectives. *See Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 599 (2011) (plurality opinion). An obstacle preemption claim "does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives." *Id.* (quotation marks omitted); *accord Capron v. Off. of Attorney General of Mass.*, 944 F.3d 9, 39-40 (1st Cir. 2019) (noting need for "at least" evidence of "significant conflict").

No obstacle exists here. The INA allows local assistance with immigration enforcement but makes participation entirely voluntary. This permissive construction is not an accident; it reflects the anticommandeering principles in the Tenth Amendment, which a compulsory construction would violate. The INA therefore does not conflict with or preempt the Trust Act.

### 1.  The INA Allows, But Does Not Require, Local Assistance with Federal Immigration Enforcement

The INA makes local cooperation with immigration enforcement voluntary. For example, 8 U.S.C. § 1357(g) allows for agreements between the federal government and interested localities by which local law enforcement *may* perform the functions of immigration officers, but it expressly

---

[5] The fact that the United States is challenging a local ordinance does not alter this analysis. *See Hillsborough Cnty., Fla. v. Automated Med. Labs, Inc.*, 471 U.S. 707, 713 (1985) ("[F]or the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws.").

states: "Nothing in this subsection shall be construed to *require* any State or political subdivision of a State to enter into an agreement." 8 U.S.C. § 1357(g)(9) (emphasis added); *see also* Compl. ¶ 28 (conceding that § 1357(g) merely "preserve[s] states['] and localities' ability 'to cooperate'" (quoting § 1357(g)(10)(B))). Similarly, 8 U.S.C. § 1103 allows for "cooperative agreements" between the federal government and state and local agencies. 8 U.S.C. §§ 1103(a)(11)(B), (c). Even an immigration detainer "is a *request*" and merely "serves to advise" local officials of that request, 8 C.F.R. § 287.7(a) (emphasis added), a fact the Complaint also acknowledges, *see* Compl. ¶ 23 (quoting 8 C.F.R. § 287.7(a)); *see also United States v. Female Juvenile, A.F.S.*, 377 F.3d 27, 35 (1st Cir. 2004) (a detainer is a "request" and "not, standing alone, an order of custody"); *Galarza v. Szalczyk*, 745 F.3d 634, 640-43 (3d Cir. 2014) (collecting cases); *Lunn*, 477 Mass. at 526 (noting the United States' "well founded" concession "that compliance by State authorities with immigration detainers is voluntary, not mandatory").

Beyond the explicitly voluntary provisions cited above, the INA does not elsewhere impose any affirmative obligation on local governments or officials. *See, e.g.*, 8 U.S.C. §§ 1357(d), 1226(a), 1226(c), 1231(a). The INA, including those sections cited in the Complaint, imposes such obligations only on *federal* officials. *See, e.g.*, Compl. ¶ 24 ("*DHS is statutorily required . . .* to consider whether to issue a detainer") (citing 8 U.S.C. § 1357(d)); *id.* ("*DHS is required to take into custody certain aliens*") (citing 8 U.S.C. § 1226(c)(1)(E)(ii)); *id.* ("*DHS must also take into custody other inadmissible aliens*") (citing 8 U.S.C. § 1226(c)(1)(E)(i)); *id.* ¶ 25 ("The Laken Riley Act requires *DHS* to detain aliens who are unlawfully present") (citing Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025)); *id.* ¶ 44 ("*Federal agents* are required to detain illegal aliens who have committed certain offenses") (citing 8 U.S.C. §§ 1226(c), 1357(d), Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3) (emphasis added to all).

Put simply, the INA does not require that local governments assist in immigration enforcement. Courts have consistently held as much. *See, e.g.*, *McHenry Cnty. II*, 44 F.4th at 589 ("Section 1103(a)(11)(B) contemplates discretionary and voluntary choices by States or local entities to assist the federal government with immigration detention, or not. It simply does not command that they do so."); *California II*, 921 F.3d at 889 ("Federal law provides states and localities the *option*, not the *requirement*, of assisting federal immigration authorities."). For that reason, courts have also found that declining Congress's invitation of voluntary participation, and refusing to affirmatively participate in immigration enforcement, does not amount to obstruction. *See, e.g.*, *McHenry Cnty. II*, 44 F.4th at 592 ("It would make no sense to hold that a federal statute premised on State cooperation preempts a State law withholding that cooperation" because "States are not bound by [the] hope or expectation" that they cooperate.); *City of El Cenizo, Texas v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("Federal law does not suggest the intent—let alone a 'clear and manifest' one—to prevent states from regulating *whether* their localities cooperate in immigration enforcement. Section 1357 does not require cooperation at all."); *California II*, 921 F.3d at 888 ("[R]efusing to help is not the same as impeding[.]").[6]

Likewise, the City's decision not to participate in the INA's voluntary civil immigration enforcement regime does not amount to obstruction. The Complaint challenges the Trust Act provisions that limit the use of City resources for sharing "personal information" (such as name,

---

[6] *See also City of Chicago v. Sessions*, 888 F.3d 272, 282 (7th Cir. 2018) (noting, with respect to "refusal of the local law enforcement to aid in civil immigration enforcement," that "nothing in this case involves any affirmative *interference* with federal law enforcement at all, nor is there any interference whatsoever with federal immigration authorities"), *vacated en banc in part on other grounds*, Nos. 17-2991 & 18-2649, 2018 WL 4268814 (7th Cir. Aug. 10, 2018); *Cnty. of Ocean*, 475 F. Supp. 3d at 362, 381-82 ("There is no indication that Congress, in enacting the INA, sought to usurp" local "decision[s] not to cooperate with the enforcement of federal immigration law," which are "a clear exercise of the State's police power to regulate the conduct of its own law enforcement agencies"; "the fact that the federal government may, without the cooperation of local law enforcement agencies, expend extra efforts and resources to apprehend aliens who are subject to removal, does not create the kind of 'direct' obstacle necessary to trigger conflict preemption."); *Illinois*, 2025 WL 2098688, at *22 n.18 ("The United States repeatedly conflates the INA's 'codification of comity,' with a *requirement* that States facilitate federal immigration enforcement. This is incorrect. Comity by definition is not a legal requirement.") (citations omitted).

Social Security number, and address) or transferring custody of individuals for purposes of civil immigration enforcement, Compl. ¶ 6 (citing Trust Act, §§ 1.9(D)(1)(a)-(b)), as well as its requirement of a criminal warrant for the City to detain an individual who is eligible for release, Compl. ¶¶ 8, 45; *see* Trust Act, § 1.9(B). But nothing in the INA requires that the City share "personal information," maintain and transfer custody pursuant to civil detainer requests, or honor administrative warrants. The City's decision not to do so reflects its choice of how to deploy limited resources and is not an obstacle to the enforcement of federal law. Nor does the allegation that the federal government may have to expend more resources in the absence of local cooperation trigger conflict preemption. *See* Compl. ¶¶ 46-47. The "clear command" of the INA places the burden of immigration enforcement "on the federal government, not state and local authorities"— defeating this claim. *See Cnty. of Ocean*, 475 F. Supp. 3d at 382.

## 2. The Tenth Amendment Bars the United States from Compelling Local Governments to Assist with Immigration Enforcement

Any contrary reading of the INA would produce an unconstitutional result. Under the Tenth Amendment, "'The Federal Government' may not 'command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.'" *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 473 (2018) (quoting *Printz v. United States*, 521 U.S. 898, 935 (1997)). This principle is fundamental to both the federal system and democratic accountability. "'[A] healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front,'" *New York v. United States*, 505 U.S. 144, 181-82 (1992) (quoting *Gregory*, 501 U.S. at 458), including by "promot[ing] political accountability" and "prevent[ing] Congress from shifting the costs of regulation to the States," *Murphy*, 584 U.S. at 473-74 (citations omitted). "The power of the Federal Government would be

augmented immeasurably if it were able to impress into its service—and at no cost to itself—the police officers of the 50 States." *Printz*, 521 U.S. at 922.

These concerns, while rooted in centuries-old principles, are not abstract. The United States' desired expansive understanding of preemption would lead directly to the incursion on states and localities from which the Constitution protects. The federal government would be free to pass the responsibilities of immigration enforcement on to the City, forcing the City to incur significant costs and divert resources from the criminal law enforcement that keeps Boston safe. All the while, Boston residents would not know whether actions reflected local choices or those of the federal government, thwarting political accountability. These concerns, both principled and practical, are at the heart of the Trust Act.

These anticommandeering principles further foreclose the theory on which the Complaint relies. As numerous courts have held, municipalities retain the authority not to participate in immigration enforcement; if the INA did not give them authority to decline, it would unconstitutionally compel their participation. *See City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020) ("The federal government cannot merely conscript the police forces of the state or local governments to achieve its ends; that would eviscerate the principles of federalism that rest at the very foundation of our government."); *California II*, 921 F.3d at 888 (finding the United States' obstruction claim "runs directly afoul of the Tenth Amendment").[7] Here, Boston has declined the INA's invitation, and the Tenth Amendment protects the City's authority to do so.

---

[7] *See also McHenry Cnty. II*, 44 F.4th at 590, 590 n.4, 591-92; *City of El Cenizo, Texas*, 890 F.3d at 178; *Galarza*, 745 F.3d at 644; *Colorado v. U.S. Dep't of Justice*, 455 F. Supp. 3d 1034, 1059-60 (D. Colo. 2020); *Cnty. of Ocean*, 475 F. Supp. 3d at 376-79; *Oregon v. Trump*, 406 F. Supp. 3d 940, 971-73 (D. Or. 2019), *aff'd in part and vacated as moot in part sub nom. City & Cnty. of San Francisco v. Garland*, 42 F.4th 1078 (9th Cir. 2022); *City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 949-53 (N.D. Cal. 2018), *aff'd in part, vacated in part on other grounds*, 965 F.3d 753 (9th Cir. 2020); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 325-31 (E.D. Pa. 2018), *aff'd in part & vacated in part on other grounds*, *City of Philadelphia v. Att'y Gen. of U.S.*, 916 F.3d 276 (3d Cir. 2019); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 866-73 (N.D. Ill. 2018), *aff'd on other grounds*, 961 F.3d 882; *California*

### B.  The INA Does Not Expressly Preempt the Trust Act

Express preemption exists where the "intent to preempt state law is made explicit in the language of a federal statute." *Consumer Data Indus. Ass'n v. Frey*, 26 F.4th 1, 5 (1st Cir. 2022). As such, express preemption analysis "start[s] with the text and context of the provision itself." *Id*. at 6.

There is no express preemption here. First, 8 U.S.C. §§ 1373 and 1644—the statutes relied on by the United States, Compl. ¶ 43—narrowly prohibit governments from restricting voluntary communication of "information regarding . . . citizenship or immigration status" with immigration officers. The Trust Act does not restrict sharing immigration status information; indeed, the Trust Act expressly *permits* compliance with these provisions. *See* Trust Act, § 1.9(D)(3). As a result, there is no conflict at all, much less an "explicit" command giving rise to preemption. Second, in an effort to manufacture a conflict between the Trust Act and §§ 1373 and 1644, the United States baldly asserts that §§ 1373 and 1644 reach far more broadly than their plain text. But that statutory rewrite fails as a matter of statutory construction and under the Tenth Amendment. Third, §§ 1373 and 1644 lack preemptive effect. To be valid, a preemption provision must regulate private actors, *Murphy*, 584 U.S. at 479; but §§ 1373 and 1644 regulate only governments. The United States' express preemption arguments thus fail.[8]

### 1.  There is No Conflict Between §§ 1373 and 1644 and the Trust Act

Sections 1373 and 1644 prohibit government entities from restricting voluntary communication with federal immigration officers of, respectively, "information regarding the citizenship or immigration status, lawful or unlawful, of any individual," 8 U.S.C. § 1373(a), and

---

*I*, 314 F. Supp. 3d at 1101; *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 534 (N.D. Cal. 2017); *Illinois*, 2025 WL 2098688, at *23-25.

[8] To the extent the United States claims that the Trust Act creates an obstacle to enforcement of §§ 1373 and 1644, that argument fails for the same reasons stated in this section.

"information regarding the immigration status, lawful or unlawful, of an alien in the United States," 8 U.S.C. § 1644. Contrary to the United States' assertions, the Trust Act comports with both provisions: it makes no prohibited restriction and it expressly provides for compliance.

First, the Trust Act does not prohibit the sharing of citizenship or immigration status—the only information addressed by §§ 1373 and 1644. *See Cnty. of Ocean*, 475 F. Supp. 3d at 374-76 ("[A] plain reading of sections 1373(a) and 1644 reflects that the only information that state and local governments are required to share is the legal status—*i.e.*, citizenship or immigration status—of an individual.") (collecting cases). The Trust Act limits City personnel from providing solely "personal information" and "a person's release date or time" to federal immigration officers for the purpose of civil immigration enforcement. *See* Trust Act, §§ 1.9(D)(1)(a)(3)-(4). "Personal Information" is defined in the Act to include "[a]ny information . . . that can be used, either alone or in combination with other information, to identify individual subjects, such as his or her name, Social Security number, physical description, home address and/or work address." *Id.* § 1.9(A). Because citizenship and immigration status cannot "be used . . . to identify" an individual, unlike the other terms in the definition, the Trust Act—by its plain terms—places no limit on the voluntary communication of such information.

Second, the Trust Act expressly provides for compliance with §§ 1373 and 1644. It states that "[t]his Section does not prohibit or restrict any [City official] from complying with 8 U.S.C. §§ 1373 and 1644." Trust Act, § 1.9(D)(3). That clause disposes of the United States' express preemption claim. *See, e.g.*, *City & Cnty. of San Francisco v. Garland*, 42 F.4th at 1086 (relying on "'savings clause, which requir[ed] compliance with federal law'" to hold that challenged Oregon law did "not conflict with Section 1373" (quoting *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753, 763-64 (9th Cir. 2020))); *Illinois*, 2025 WL 2098688, at *13 n.13 (similar as to

Illinois law). Further, given the wide berth the Trust Act carves for §§ 1373 and 1644, were there any shadow of a doubt as to the existence of a conflict, the constitutional avoidance doctrine would require finding that the Trust Act permits communication of citizenship and immigration status in harmony with federal law. *See Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018).

### 2. The United States' Interpretation of §§ 1373 and 1644 Conflict with those Sections' Plain Text and the Tenth Amendment

The United States advances an expansive reading of §§ 1373 and 1644 to manufacture a conflict with the Trust Act, but its overbroad reading conflicts with the Tenth Amendment. Although the plain text of §§ 1373 and 1644 prohibits limits on sharing only "information regarding . . . citizenship or immigration status," the Complaint suggests that the statutes should be read far more broadly, to reach any limitation on sharing any information that would assist federal immigration officers—including personal and release date information that cannot be disclosed under the Trust Act. *See, e.g.*, Compl. ¶¶ 43, 54; Trust Act, §§ 1.9(D)(1)(a)(3)-(4). That sweeping reading is at odds with the unambiguous statutory text. Personal identifying information, like a home address, and release date information have nothing to do with an individual's legal status in the United States. As a result, courts across the country have rejected attempts just like this one to reach beyond the text of the statute. *See, e.g.*, *California II*, 921 F.3d at 891 ("[T]he phrase 'information regarding the citizenship or immigration status, lawful or unlawful, of any individual' is naturally understood as a reference to a person's legal classification under federal law.") (collecting cases); *Illinois*, 2025 WL 2098688, at *10 ("This issue has been treated extensively by other courts. Without exception, each has rejected the United States's capacious reading of § 1373.") (collecting cases). This Court should do the same.

In addition, adoption of the United States' broad interpretation of "information regarding . . . citizenship or immigration status" would conflict with the Tenth Amendment, which deprives

Congress of "the power to issue direct orders to the governments of the States." *Murphy*, 584 U.S. at 471. Under the United States' interpretation, §§ 1373 and 1644 are just such orders; they would require state and local governments to cede authority over their employees, allowing local time and resources to be used maintaining and sharing "personal information," "[information] regarding a person's release date or time," and any other information immigration officers deemed relevant to the federal government. *See* Compl. ¶ 43. That broad assertion of authority would "dictate[] what a state legislature may and may not do"—depriving states and localities of control over their employees' time, expenditure of local resources, and legislative decisionmaking, and blurring the lines of accountability between localities and the federal government—the very ills the anticommandeering doctrine addresses. *See Murphy*, 584 U.S. at 473-75. For these reasons, courts to consider the issue have found that §§ 1373 and 1644 are unconstitutional. *See, e.g.*, *Cnty. of Ocean*, 475 F. Supp. 3d at 378 ("[I]t is clear that if sections 1373(a) and 1644 were broadly construed to cover all types of information possibly related to the enforcement of immigration law, including personal identifying data and dates of release of inmates, they would violate the Tenth Amendment under the anticommandeering doctrine."); *see id.* at 378 n.20 (collecting cases finding the statutes to be facially unconstitutional and noting that these holdings "[f]urther undercut[]" the plaintiffs' claims, but ultimately not reaching that issue).[9]

### 3. Sections 1373 and 1644 Cannot Preempt the Trust Act Because They Do Not Regulate Private Conduct

Even if there were a conflict, which there is not, the sections' lack of preemptive effect is dispositive. In *Murphy*, 584 U.S. 453, the Supreme Court made clear that, because "the

---

[9] The Court need not reach the issue of whether even a narrow reading of the statutes would render them unconstitutional unless it finds a conflict between their appropriate (narrow) reading and the Trust Act. *See Colorado*, 455 F. Supp. 3d at 1060 ("[W]hile §§ 1373 and 1644 arguably offend the policy considerations supporting the anticommandeering principle, I stop short of ruling the statutes unconstitutional because I . . . need not do so.").

Constitution 'confers upon Congress the power to regulate individuals, not States,'" all valid preemption provisions must be "based on a federal law that regulates the conduct of private actors, not the States." *Id.* at 478-79 (quoting *New York*, 505 U.S. at 166). That is, no federal law may have preemptive effect unless it regulates private conduct. Because §§ 1373 and 1644 do not regulate private conduct, the sections do not have preemptive effect.

Instead, §§ 1373 and 1644 seek to regulate solely government conduct. Specifically, § 1373 "is a clear prohibition on *state* action; it says nothing about private actors, so it cannot be fairly read to regulate them." *Ocean Cnty. Bd. of Comm'rs*, 8 F.4th at 182 (citing *Murphy*, 584 U.S. at 479). Further, § 1644—a nearly identical statute that bars "prohibit[ing]" or "restrict[ing]" a government's exchange of immigration status information—"does not regulate private actors" because only governmental bodies can restrict their own sharing of such information. *See id.* "[T]hat neither § 1373 nor § 1644 regulates private actors is fatal to [any] argument that they preempt" local law. *Id.* Because neither section regulates private conduct, neither preempts the Trust Act. Numerous courts have held the same. *See Colorado*, 455 F. Supp. 3d at 1059 (Sections 1373 and 1644 "affect state and local government entities and officials; they do not regulate private actors as *Murphy* requires for preemption."); *Illinois*, 2025 WL 2098688, at *16 ("[T]here is no way to read § 1373 as regulating anyone other than States and their political subdivisions," thus "nullif[ying] § 1373 as a preemption provision[.]").[10]

## II.     The Trust Act Does Not Violate the Intergovernmental Immunity Doctrine

A state or local law violates the intergovernmental immunity doctrine if it "'regulate[s] the United States directly or discriminate[s] against the Federal Government or those with whom it deals.'" *United States v. Washington*, 596 U.S. 832, 838 (2022) (quoting *North Dakota v. United*

---

[10] *See also Oregon*, 406 F. Supp. 3d at 972; *City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d at 950; *City of Philadelphia*, 309 F. Supp. 3d at 329.

*States*, 495 U.S. 423, 435 (1990) (plurality opinion)). The Trust Act does neither—it regulates local officials in order to implement Boston's criminal law enforcement priorities. Any incidental impact on the federal government is both permissible and consistent with the Tenth Amendment. The United States' intergovernmental immunity arguments have predictably been rejected by every court to consider them.[11] As a result, Counts II and III should be dismissed.

### A.  The Trust Act Does Not Discriminate Against the Federal Government

A state or local law "does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them." *Washington v. United States*, 460 U.S. 536, 544-45 (1983); *see also, e.g.*, *Dawson v. Steager*, 586 U.S. 171, 175, 177 (2019) (requiring "differential treatment" of "similarly situated state and federal [actors]"). The United States does not identify any similarly situated entity here, because it cannot: The Trust Act implements a neutral policy preventing City personnel from engaging in civil immigration enforcement. *See, e.g.*, *McHenry Cnty. II*, 44 F.4th at 593-94 & n.7 ("The State's refusal to cooperate in the immigration context—a possibility contemplated by the relevant federal statutes—does not constitute discrimination against the federal government."); *California II*, 921 F.3d at 881 (similar); *Cnty. of Ocean*, 475 F. Supp. 3d at 385 (similar).

To the extent the Act has some impact on the federal government with respect to immigration enforcement, it is only because the federal government has sole authority in that area. But the "fact that the Act touches on an exclusively federal sphere is not enough to establish discrimination"—proof of "[d]ifferential treatment" is necessary. *McHenry Cnty. II*, 44 F.4th at 594 (citing *Washington*, 460 U.S. at 544-45); *see also, e.g.*, *id.* at 593 ("[A] State law is not

---

[11] *See McHenry Cnty. I*, 574 F. Supp. 3d at 581-82, *aff'd in relevant part*, *McHenry Cnty. II*, 44 F.4th at 592-94 & n.7; *Cnty. of Ocean*, 475 F. Supp. 3d at 385; *California I*, 314 F. Supp. 3d at 1110-11, *aff'd in relevant part*, *California II*, 921 F.3d at 891; *Illinois*, 2025 WL 2098688, at *25-27; *New Jersey*, 2021 WL 252270, at *13-14.

unconstitutional merely because it increases costs for the federal government, 'so long as the law imposes those costs in a neutral, nondiscriminatory way.'" (quoting *Washington*, 596 U.S. at 839)). Here, there is no better treated comparator because there is no comparator to federal immigration officers. Although the Complaint attempts to create one by vaguely asserting that the Trust Act favors "other law enforcement officials," *see* Compl. ¶ 59, that allegation is insufficient: First, the Complaint does not allege *which* law enforcement officials are supposedly favored, or *how*. Second, to the extent the Complaint means to allege that *criminal* law enforcement officers are favored over *civil* immigration officers, *see* Compl. ¶ 49, those two classes of officers are generally not similarly situated, and when they are (that is, when they are enforcing criminal law), the Trust Act treats them equally. *See* Compl. ¶ 36 (citing Trust Act, § 1.9(d)(2)-(3)); *Illinois*, 2025 WL 2098688, at *26 (rejecting criminal law enforcement as a comparator); *New Jersey*, 2021 WL 252270, at *14 ("[C]ivil immigration operations and criminal law enforcement are not similarly situated[.]"). The lack of any similarly situated comparator "ends the [discrimination] inquiry." *Illinois*, 2025 WL 2098688, at *25.

Further, as noted above, the only burden the Trust Act may incidentally place on the federal government—requiring it to use its own resources to do its own job—is not an impermissible one. A state or locality declining to participate in a federal regulatory program is not discrimination; it is a sovereign exercise protected by the Tenth Amendment. *See, e.g.*, *Murphy*, 584 U.S. at 471-73; *California II*, 921 F.3d at 890 ("Federal schemes are inevitably frustrated when states opt not to participate in federal programs or enforcement efforts."). Finding otherwise would render the Tenth Amendment a dead letter. *See, e.g.*, *California II*, 921 F.3d at 891 ("A finding that [the law] violates the doctrine of intergovernmental immunity would imply that [a state] *cannot* choose to . . . refus[e] to assist [federal] enforcement efforts—a result that would be inconsistent with the

Tenth Amendment and the anticommandeering rule."); *Illinois*, 2025 WL 2098688, at *27 (similar); *New Jersey*, 2021 WL 252270, at *13 (similar).

### B.  The Trust Act Does Not Regulate the Federal Government

A state or local law violates the intergovernmental immunity doctrine "if it regulates the United States directly." *North Dakota*, 495 U.S. at 435; *see also McHenry Cnty. II*, 44 F.4th at 592 (noting that direct regulation occurs when a State "places a prohibition on the Federal Government" (collecting cases)). The Trust Act does no such thing. By its plain terms, the Trust Act regulates only the conduct of City officials. *See* Compl. ¶ 6 (the Act "directs Boston law enforcement officers"), ¶ 32 (the Act "mak[es] clear the role of Boston Police officers"); Trust Act, §§ 1.9(B)-(D). It does not regulate the federal government in any way. *See McHenry Cnty. II*, 44 F.4th at 593 (no direct regulation where Illinois statute limiting cooperation with immigration enforcement "regulate[d] only State and local entities and law enforcement—not the federal government"); *Cnty. of Ocean*, 475 F. Supp. 3d at 385 (similar); *Illinois*, 2025 WL 2098688, at *26 (similar); *New Jersey*, 2021 WL 252270, at *13 (similar).

The Complaint seeks to twist that purely internal regulation into a restriction on the federal government's conduct. But that effort, if successful, would strip the prohibition on "direct" regulation of any meaning. For example, the United States alleges that Boston's "refus[al] to honor civil detainers and warrants" constitutes direct regulation of "these means for federal immigrations [*sic*] officials to carry out their statutory functions." Compl. ¶ 63. But even in the United States' presentation, there is no direct regulation of any federal entity; the Trust Act limits only *City* officials' actions. *See* Trust Act, § 1.9(D). The Complaint does not, and could not, allege that the Trust Act "directly" places any limit on *federal* officials' exercise of their authority. *See Illinois*, 2025 WL 2098688, at *26-27 (rejecting an identical claim for that reason). The fact that, as "a

consequence of the Act," the federal government cannot conscript City officials into its immigration enforcement efforts does not amount to direct regulation. *See McHenry Cnty. II*, 44 F.4th at 593 (state law limiting the state's and localities' ability to house immigration detainees "imposes no direct regulation on any federal official or agency" because the law "directly regulate[d] only State and local entities and law enforcement").[12]

Further, by ratifying the Trust Act, Boston made a decision it is entitled to make under both the INA, *see, e.g.*, *McHenry Cnty. II*, 44 F.4th at 593 (noting voluntary nature of local cooperation with immigration enforcement); *supra* pp. 6-9 (same), and the Tenth Amendment, *see, e.g.*, *Illinois*, 2025 WL 2098688, at *27 (rejecting identical claim because doing otherwise "would provide an end-run around the Tenth Amendment" and "allow the federal government to commandeer States under the guise of intergovernmental immunity" (collecting cases)).

## III.   The United States Cannot Maintain Its Claims Against the Mayor, Commissioner, or Boston Police Department

"[A]n official-capacity suit is . . . treated as a suit against the entity." *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *accord Surprenant v. Rivas*, 424 F.3d 5, 19 (1st Cir. 2005). As a result, the United States' official-capacity claims against Mayor Wu and Commissioner Cox are duplicative of its claims against the City, and "[c]ourts routinely dismiss [such] duplicative official-capacity claims." *Brown v. City of Brockton*, No. 24-CV-12048-ADB, 2025 WL 2677231, at *4 (D. Mass. Sept. 18, 2025) (collecting cases); *Murphy v. Town of Natick*, 516 F. Supp. 2d 153,

---

[12] In similar cases, the United States has cited out-of-circuit authority supporting the proposition that state and local law regulates the federal government if it bars private entities from contracting with the federal government, to the extent the bar effectively controls the federal government's conduct. *See, e.g.*, *CoreCivic, Inc. v. Gov. of N.J.*, 145 F.4th 315, 325-28 (3d Cir. 2025); *United States v. King Cnty.*, 122 F.4th 740, 756-57 (9th Cir. 2024); *GEO Group, Inc. v. Newsom*, 50 F.4th 745, 757-58 (9th Cir. 2022). But none of those cases address states' and localities' regulation of their own conduct, nor does the Trust Act exert control over the federal government or its contractors. *See CoreCivic, Inc.*, 145 F.4th at 327 (distinguishing *McHenry Cnty. II* on those grounds); *King Cnty.*, 122 F.4th at 758 (similar as to *California II* and *McHenry Cnty. II*); *Geo Grp.*, 50 F.4th at 751 & n.1 (9th Cir. 2022) (noting law limiting local participation in immigration enforcement was not at issue).

158 (D. Mass. 2007) (similar as to police chiefs). In addition, the Complaint contains no allegations concerning the role of either individual defendant with respect to the Trust Act provisions challenged here. The Complaint disapprovingly cites statements by Mayor Wu supporting the Trust Act and a statistical report Commissioner Cox issued pursuant to the Trust Act, but it does no more. *See* Compl. ¶¶ 2, 40. Neither allegation is sufficient to state "a plausible claim for relief." *See Iqbal*, 556 U.S. at 678-79. For the same reason, the Complaint fails to "allege injuries traceable to [each] individual defendant"—a prerequisite for standing. *See Illinois*, 2025 WL 2098688, at *6 (dismissing similar claims against individual defendants).[13]

The claim against the Boston Police Department is also defective. The Boston Police Department "has no legal existence or liability to suit separate from the City of Boston" and is "not a suable entity." *Douglas v. Boston Police Dep't*, No. C.A. 10-11049-WGY, 2010 WL 2719970, at *2 (D. Mass. July 1, 2010) (collecting cases); *see, e.g.*, *Burnham v. Dudley Dist. Ct.*, No. 15-40031-DHH, 2015 WL 5698418, at *3 (D. Mass. Sept. 28, 2015) (same as to all Massachusetts police departments); *Salem v. Stoneham Police Dep't*, 752 F. Supp. 3d 282, 290 (D. Mass. 2024) (noting "overwhelming caselaw" on this point).

Accordingly, all claims against Mayor Wu, Commissioner Cox, and the Boston Police Department should be dismissed.

## **CONCLUSION**

For the foregoing reasons, this Court should **DISMISS** the Complaint with prejudice.

---

[13] As always, "plaintiffs must demonstrate standing for each claim that they press against each defendant," *Murthy v. Missouri*, 603 U.S. 43, 61 (2024), and plaintiffs bear the burden of "clearly . . . alleg[ing] facts demonstrating" standing in the complaint, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), as revised (May 24, 2016).

Dated: November 17, 2025

Respectfully submitted,

**CITY OF BOSTON,**
**MICHELLE WU,**
**BOSTON POLICE DEPARTMENT,**
**AND MICHAEL A. COX**

By their attorneys:

Adam Cederbaum
Corporation Counsel


*/s/ Samuel B. Dinning*
Samuel B. Dinning (BBO # 704304)
Thomas J. Broom (BBO # 703136)
Edward F. Whitesell (BBO # 644331)
Senior Assistant Corporation Counsels
City of Boston Law Department
One City Hall Plaza, Room 615
Boston, MA 02201
(617) 635-4034
samuel.dinning@boston.gov
thomas.broom@boston.gov
edward.whitesell@boston.gov

Erin Monju (DC # 90036952)*
Toby Merrill (BBO # 601071)
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
Tel: (510) 738-6788
erin@publicrightsproject.org
toby@publicrightsproject.org

* *Pro hac vice* motion forthcoming

21

## <u>CERTIFICATE OF SERVICE</u>

I, Samuel Dinning, hereby certify that on November 17, 2025, I served a copy of the foregoing document via electronic filing (ECF) on all counsel of record.

*/s/ Samuel B. Dinning*
Samuel B. Dinning
