UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

THE UNITED STATES OF AMERICA,

          Plaintiff,

      v.

THE CITY OF BOSTON; MICHELLE WU,
Mayor of the City of Boston, in her Official
Capacity; BOSTON POLICE DEPARTMENT;
MICHAEL A. COX, Police Commissioner, in his
Official Capacity,

          Defendants.

Civil Action No. 1:25-cv-12456

---

**[PROPOSED] BRIEF OF THE COMMONWEALTH OF MASSACHUSETTS AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

ANDREA JOY CAMPBELL
 *Attorney General*
 *Commonwealth of Massachusetts*

Tasha J. Bahal, BBO No. 675935
 *Deputy State Solicitor*
Elizabeth D. Matos, BBO No. 671505
 *Chief, Civil Rights Division*
David R. Rangaviz, BBO No. 681430
Jared B. Cohen, BBO No. 689217
Isabelle Longfellow, BBO No. Pending
 *Assistant Attorneys General, Civil Rights Division*
One Ashburton Place
Boston, MA 02108
(617) 963-2833
jared.b.cohen@mass.gov

**TABLE OF CONTENTS**

INTERESTS OF AMICUS AND INTRODUCTION ...................................................................1

ARGUMENT ..........................................................................................................................3

I.     The Constitution Ensures That States And Cities Can Establish Law Enforcement Policies And Priorities Consistent With State And Federal Law ..........................................3

II.    The Ordinance Is Consistent With State And Federal Law ..................................................8

     A.   The Ordinance Is Consistent With Massachusetts State Law.......................................8

     B.   Neither Massachusetts State Law Nor The Ordinance Conflicts With Federal Immigration Law ....................................................................................................10

III.   The Ordinance Is Supported By Strong Governmental Interests .......................................13

     A.   The Ordinance Improves Public Safety ...................................................................14

     B.   The Ordinance Improves Public Health....................................................................18

     C.   The Ordinance Preserves Scarce Local Resources ....................................................19

CONCLUSION.......................................................................................................................20

# TABLE OF AUTHORITIES

## Cases

*Arizona v. United States*,
    567 U.S. 387 (2012)……………………...………………..…………..………..3, 7-8

*City of Philadelphia v. Attorney General of United States*,
    916 F.3d 276, 281 (3rd Cir. 2019)……………………………………………...9

*Commonwealth v. Craan*,
    469 Mass. 24 (2014)……………………………………………………………8

*Commonwealth v. Jewett*,
    471 Mass. 624 (2015)…………………………………………………………..9

*Commonwealth v. Gernrich*,
    476 Mass. 249 (2017)…………………………...……………………………...9

*Commonwealth v. Hason*,
    387 Mass. 169 (1982)…………………………………………………………..9

*Commonwealth v. Howe*,
    405 Mass. 332 (1989)…………………………………………………………..9

*DeCanas v. Bica*,
    424 U.S. 351 (1976)……………………………………………….……………6-7

*Doe v. U.S. Immigration & Customs Enforcement*,
    490 F. Supp. 3d 672 (S.D.N.Y. 2020)…………………………………………7

*Galarza v. Szalczyk*,
    745 F.3d 634, 642 (3rd Cir. 2014)……………………………………………...9

*Gonzales v. Peoria*,
    722 F.2d 468, 474 (9th Cir.1983)………………………………………………8

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991)…………………………………………………………3-4, 7

*Hodgers–Durgin v. de la Vina*,
    199 F.3d 1037 (9th Cir.1999)…………………………………………………..8

*Kansas v. Garcia*,
    589 U.S. 191, 212 (2020)……………………………………………………....13

*Lunn v. Commonwealth*,
   417 Mass. 517 (2017)………………………………….……………..……1-2, 9-11

*Maine Forests Products Council v. Cormier*,
   51 F.4th 1 (1st Cir. 2022)………………………………………………….6

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996)………………………………………………………6

*Murphy v. National Collegiate Athletic Association*,
   584 U.S. 453 (2018)………………………………………….……………5

*National Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012)……………………………………………………….4-5

*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
   514 U.S. 645 (1995)……………………………………………….……………6

*New York v. United States*,
   505 U.S. 144 (1992)…………………………………………………….4-5, 9

*Nixon v. Missouri Municipal League*,
   541 U.S. 125 (2004)………………………………………………………6

*Nwauzor v. GEO Grp., Inc.*,
   127 F.4th 750 (9th Cir. 2025)………………………………………………..7

*Plyler v. Doe*,
   457 U.S. 202 (1982)………………………………………………….…………6

*Printz v. United States*,
   521 U.S. 898 (1997)……………………………………………….……….5, 9

*Puente Ariz. v. Arpaio*,
   821 F.3d 1098 (9th Cir. 2016)…………………………………………………7

*Ramon v. Short*,
   460 P.3d 867, 873, 399 Mont. 254, 265 (Mont. 2020)…………………………9

*State v. Lopez-Carrera*,
   247 A.3d 842, 859, 245 N.J. 596, 626 (N.J. 2021)……………………………..9

*United Bldg. & Constr. Trades Council of Camden Cnty. & Vicinity v. Mayor of Camden*,
   465 U.S. 208 (1984)………………………………………….……………5

*United States v. California,*
    921 F.3d 865 (9th Cir. 2019)…………………………………….……………………..6

*United States v. City of Newark, et al.,*
    No. 25-cv-05081 (D.N.J.)………………………………………………………………3

*United States v. City of Rochester, et al.,*
    No. 25-cv-06226 (W.D.N.Y.)…………………………………………………………..3

*United States v. Di Re,*
    332 U.S. 581 (1948)……………………………………………………………….....8

*United States v. Illinois,*
    No. 25-cv-1285, 2025 WL 2098688 (N.D. Ill. July 25, 2025)……………….…….3, 12-13

*United States v. Morrison,*
    529 U.S. 598 (2000)………………………………………………….…………….5-6

*United States v. New York,*
    No. 25-cv-744, 2025 WL 3205011 (N.D.N.Y. Nov. 17, 2025)…………………….3, 11-13

*United States v. State of Colorado, et al.,*
    No. 25-cv-01391 (D. Colo.)…………………………………………………………….3

*United States v. State of New York, et al.,*
    No. 25-cv-00205 (N.D.N.Y)…………………………………………………………….3

*United States v. Valdez-Hurtado,*
    638 F. Supp. 3d 879, 889 (N.D. Ill. 2022)……………………………………………...9

*Younger v. Harris,*
    401 U.S. 37 (1971)……………………………………………………………………..3

Statutes and Regulations

8 U.S.C. § 1357…………………………………………………………………………10-11

8 U.S.C. § 1373……………………………………………………………...…….10-12

8 U.S.C. § 1644…………………………………………………………………………10-12

8 C.F.R. § 287.7……………………………………………………………………………...9

Boston Trust Act, Bos. Mun. Code ch. 11, § 1.9…………………………………………….7

<u>Other Authorities</u>

Aidan Enright, et al., *International Students: Poorly Suited Immigration Pathways Stymie Formation of High Growth Businesses* 4, Pioneer Institute, (July 2024)………………..14

Alexandra Sirota & Lissette Guerrero, Budget & Tax Ctr., N.C. Ctr. For Just., *Local Communities Face High Costs of Federal Immigration Enforcement* 4-5 (Apr. 2019)…19

*Allegheny County Settles Lawsuit Involving US Citizen Illegally Detained by ICE*, ACLU Pennsylvania (Nov. 18, 2015)……………………………………………………………19

American Immigration Council, New Americans in the Boston Metro Area (2023)……………14

Americans for the Arts, *Arts Impact Explorer Fact Sheet: Arts + Immigration* (July 2024)……14

Attorney General Guidance: General Information for Massachusetts Service Providers Regarding Immigration Enforcement……..…………………………………………1

Attorney General Guidance: Information for Massachusetts Colleges and Universities Regarding Immigrant Students……………………………………………………1

Attorney General Guidance: Information for Massachusetts Healthcare Providers Regarding Immigration Enforcement and Access to Care and Assistance Programs………………..1

Attorney General Guidance: Information for Massachusetts Municipalities Regarding Immigration Enforcement………………………………………………1

Attorney General Guidance: Know Your Rights: ICE Enforcement: A Guide for Immigrants, Families, and Communities……………………………………………………1

Attorney General Guidance Regarding K-12 Schools' Obligations to Protect Students and Their Information………………………………………………………...1

City of Boston, *Council Reaffirms the Trust Act* (Dec. 6, 2024)………………………………..7-8

Daniel E. Martinez et al., *Providing Sanctuary or Fostering Crime? A Review of the Research on "Sanctuary Cities" and Crime*, 12 Socio. Compass et12547 (Jan. 2018)………………17

Elizabeth Fussell, *The Deportation Threat Dynamic and Victimization of Latino Migrants: Wage Theft and Robbery*, 52 Socio. Q. 593 (2011)……………………………………………16

Elizabeth M. McCormick, *Federal Anti-Sanctuary Law: A Failed Approach to Immigration Enforcement and a Poor Substitute for Real Reform*, 20 Lewis & Clark L. Rev. 165 (2016)…………………………………………………………………………………18

*Immigration Detainers*, U.S. Immigration and Customs Enforcement
(Updated: May 13, 2025)……………………………………………………9

Lauren Keenan, *Boston police commissioner says dept. does not enforce
federal immigration law*, Straight Arrow News (Feb. 18, 2025)………………….…..15

Major Cities Chiefs Association, Immigration Policy……………………………………...19

Marta Ascherio, *Do Sanctuary Policies Increase Crime? Contrary Evidence from a
County-Level Investigation in the United States*, 106 Soc. Sci. Research 102743 (Aug.
2022)……………………………………………………………………..17

McConnell, Federalism: Evaluating the Founders' Design,
54 U. Chi. L. Rev. 1484 (1987)…………………………………………………...4

Merritt, The Guarantee Clause and State Autonomy: Federalism for a Third Century,
88 Colum. L. Rev. 1 (1988)………………………………………………………4

Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement
in Immigration Enforcement* (2013)…………………………………………………15

Nik Theodore & Robert Habans, *Policing Immigrant Communities: Latino Perceptions of Police
Involvement in Immigration Enforcement*, 42 J. Ethnic & Migration Stud. 970 (2016)...16

Office of the  Attorney General, *Resources for Immigrants in Massachusetts*………...................1

Omar Martinez et al., *Evaluating the Impact of Immigration Policies on Health Status Among
Undocumented Immigrants: A Systematic Review*, 17 J. Immigr. Minor. Health 947
(2015)………………………………………………………………………18

Pamela Constable, *For Immigrant Women, Domestic Violence Creates a
Double Shadow*, Wash. Post (Dec. 2, 2013)…………………………………………...15

Pratheepan Gulasekaram et al., *Anti-Sanctuary and Immigration Localism*,
119 Colum. L. Rev. 837 (2019)………………………..………………………...19

Reva Dhingra et al., *Immigration Policies and Access to the Justice System: The Effect of
Enforcement Escalations on Undocumented Immigrants and Their Communities*,
44 Pol. Behav. 1359, 1361 (2022)……………………………………………………17

Ricardo D. Martinez-Schuldt & Daniel E. Martinez, Immigration Sanctuary Policies and
Crime Reporting-Behavior: A Multilevel Analysis of Reports of Crime Victimization to
Law Enforcement, 1980 to 2004, 86 Am. Socio. Rev. 154 (2021)………………...16

Scott D. Rhodes et al., *The Impact of Local Immigration Enforcement Policies on the Health*
*of Immigrant Hispanics/Latinos in the United States,*
105 Am. J. Pub. Health 329 (2015)…………………………………………………...18

Steve Lopez, *LAPD Chief Beck Explains Why He Doesn't Want His Officers to*
*Be Immigration Cops,* L.A. Times (Jan. 28, 2017)…………………………………15

The Federalist No. 45, at 293 (James Madison)………………………………………..4

The President's Task Force on 21st Century Policing,
Final Report 18 (2015)…………………………………………………………...15

Tom K. Wong, Ctr. For Am. Progress, *The Effects of Sanctuary Policies on Crime*
*and the Economy* (Jan. 26 2017)……………………………………………………17

<u>Constitutional Provisions</u>

U.S. Const. amend. X………………………………………………………………...4

## INTERESTS OF AMICUS AND INTRODUCTION

The Commonwealth of Massachusetts has a sovereign state interest in the resolution of issues and disputes regarding the participation of state and local officials in federal immigration enforcement, and limitations on that participation. As the Commonwealth's chief law enforcement officer, the Massachusetts Attorney General has issued guidance to the public and to Massachusetts municipalities on this very question (and other closely related ones).[1] Boston's Trust Act (the "Ordinance"), and the related policies and actions of its departments and officials that are challenged in this case, are consistent with state law—including most notably the Massachusetts Supreme Judicial Court's (SJC) 2017 decision in *Lunn v. Commonwealth*, which held that Massachusetts state and local law enforcement officers have no authority to arrest or detain an individual solely on the basis of a federal civil immigration detainer. 477 Mass. 517, 537 (2017). *Lunn*, the Attorney General's guidance, and the Ordinance all take proper account of federal law to ensure that applicable provisions are duly respected and observed.

---

[1] *See* Office of the Attorney General, *Resources for Immigrants in Massachusetts*, https://www.mass.gov/info-details/resources-for-immigrants-in-massachusetts; Attorney General Guidance: Know Your Rights: ICE Enforcement: A Guide for Immigrants, Families, and Communities, https://www.mass.gov/doc/ago-ice-guidance-05292025/download; Attorney General Guidance: Information for Massachusetts Municipalities Regarding Immigration Enforcement, https://www.mass.gov/doc/information-for-massachusetts-municipalities-regarding-immigration-enforcement/download; Attorney General Guidance: Information for Massachusetts Healthcare Providers Regarding Immigration Enforcement and Access to Care and Assistance Programs, https://www.mass.gov/doc/information-for-immigrant-patients-and-their-health-care-providers-on-immigration-enforcement/download; Attorney General Guidance: General Information for Massachusetts Service Providers Regarding Immigration Enforcement, https://www.mass.gov/doc/ago-service-providers-immigration-guidance-02072025/download; Attorney General Guidance Regarding K-12 Schools' Obligations to Protect Students and Their Information, https://www.mass.gov/doc/guidance-for-k-12-schools-on-protecting-students-and-their-information/download; Attorney General Guidance: Information for Massachusetts Colleges and Universities Regarding Immigrant Students, https://www.mass.gov/doc/attorney-general-guidance-information-for-massachusetts-colleges-and-universities-regarding-immigrant-students/download.

The Commonwealth supports defendants' motion to dismiss and agrees that the Ordinance does not violate—and indeed, is entirely consistent with—federal immigration law and the United States Constitution. Amicus submits this brief to make three additional points. *First*, core constitutional principles of federalism require that state and local governments be allowed to make their own policies and judgments about protecting public safety and community welfare, as long as they do not conflict with federal or state law. The Ordinance, and the City's decision to limit its law enforcement officials' participation in civil immigration enforcement, protects the local community and enhances public welfare. Thus, the Ordinance represents a quintessential exercise of police power that the Constitution reserves to the States and their localities. There is a strong presumption against federal preemption of such local acts, a presumption that plaintiff cannot rebut or overcome.

*Second*, the Ordinance is fully consistent with state and federal law. Massachusetts law, especially *Lunn*, restricts the authority of state and local officers to arrest and detain individuals on civil immigration matters. Federal law respects those limits: it allows for state and local cooperation through voluntary agreements, but does not require (and cannot compel) participation in civil immigration enforcement. The Ordinance honors both frameworks, respecting state-law limitations and federal permissive cooperation.

*Third*, the Ordinance is supported by strong governmental interests. As both the experience of state and local law enforcement and ample social science evidence confirm, by limiting local officials' participation in civil immigration enforcement, the Ordinance safeguards the ability of Boston residents to report crimes, serve as witnesses, obtain healthcare, and otherwise interact with local officials without fear that doing so may result in adverse immigration consequences for themselves or loved ones. In this way, the Ordinance promotes both public safety and public health.

At the same time, the Ordinance ensures that limited local resources are directed to advancing local public safety priorities, such as prevention of violent crime.

The United States has brought multiple lawsuits against so-called "sanctuary" jurisdictions around the country, each featuring claims and allegations similar to those here. Two of those lawsuits have already been dismissed, after federal courts concluded that the United States failed to state any plausible claims for relief under the Supremacy Clause. *See United States v. New York*, No. 25-cv-744, 2025 WL 3205011 (N.D.N.Y. Nov. 17, 2025); *United States v. Illinois*, No. 25-cv-1285, 2025 WL 2098688 (N.D. Ill. July 25, 2025).[2] This Court should reach a similar conclusion here.

## ARGUMENT

### I.     The Constitution Ensures That States And Cities Can Establish Law Enforcement Policies And Priorities Consistent With State And Federal Law

"[O]ur Constitution establishes a system of dual sovereignty between the States and the Federal Government," *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991), recognizing that state and federal governments each "have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398 (2012). "Our Federalism" represents "a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Younger v. Harris*, 401 U.S. 37, 44 (1971). This system incorporates and relies upon a "vital . . . notion of 'comity,' that is, a proper respect for state functions," and "a

---

[2] The remaining cases have dispositive motions pending or forthcoming. *See United States v. City of Newark, et al.*, No. 25-cv-05081 (D.N.J.); *United States v. City of Rochester, et al.*, No. 25-cv-06226 (W.D.N.Y.); *United States v. State of Colorado, et al.*, No. 25-cv-01391 (D. Colo.); *United States v. State of New York, et al.*, No. 25-cv-00205 (N.D.N.Y).

continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Id.*

Indeed, our constitutional system of dual sovereignty is structured to realize the Framers' vision that "the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed . . . governments more local and more accountable than a distant federal bureaucracy." *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) (citing The Federalist No. 45, at 293 (James Madison)). They understood that dividing power would protect individual liberty. Spheres of power dispersed to state and local governments "serve[] as a check on the power of the Federal Government: By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power." *Id.* (citation omitted). The Tenth Amendment helps maintain that balance. It makes clear that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. And the Supreme Court has long emphasized the importance of determining whether a given act of federal power is duly authorized, or whether it "invades the province of state sovereignty reserved by the Tenth Amendment." *New York v. United States*, 505 U.S. 144, 155-57 (1992) (citations omitted).[3]

---

[3] "This federalist structure of joint sovereigns preserves to the people numerous advantages. It assures a decentralized government that will be more sensitive to the diverse needs of a heterogenous society; it increases opportunity for citizen involvement in democratic processes; it allows for more innovation and experimentation in government; and it makes government more responsive by putting the States in competition for a mobile citizenry." *Gregory*, 501 U.S. at 458 (citing McConnell, Federalism: Evaluating the Founders' Design, 54 U. Chi. L. Rev. 1484, 1491-1511 (1987); Merritt, The Guarantee Clause and State Autonomy: Federalism for a Third Century, 88 Colum. L. Rev. 1, 3-10 (1988)).

For these reasons, notwithstanding its considerable powers to regulate individuals and activities, "[t]he Federal Government may not compel the States to enact or administer a federal regulatory program," *New York*, 505 U.S. at 188, and it may not conscript state or local officers directly or commandeer their resources, *Printz v. United States*, 521 U.S. 898, 935 (1997). A "fundamental structural decision incorporated into the Constitution" is "the decision to withhold from Congress the power to issue orders directly to the States." *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453, 470 (2018). To protect state sovereignty, the Supreme Court has "always understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *New York*, 505 U.S. at 166.

Crucially, federalism also reserves exclusively to the States and their localities the "police power"—that is, general governing power over the vital functions of day-to-day government, including local law enforcement, public health and education, and the overall public safety and well-being of people within state and local jurisdictions. *See National Fed'n of Indep. Bus.*, 567 U.S. at 535-36; *United States v. Morrison,* 529 U.S. 598, 618-19 (2000). And the States may delegate aspects of the police power to local governments, which are "political subdivision[s] of the State from which [their] authority derives." *United Bldg. & Constr. Trades Council of Camden Cnty. & Vicinity v. Mayor of Camden*, 465 U.S. 208, 215 (1984).

None of this makes federal law irrelevant. The United States undoubtedly has a legitimate federal interest in regulating immigration and enforcing U.S. immigration laws. And the federal government maintains authority over naturalization of noncitizens, as well as their entry and removal across the nation's borders. But federal authority over immigration does not displace traditional state police powers. States and their localities retain authority over "essentially local

problems," including those affecting noncitizens within their borders. *DeCanas v. Bica*, 424 U.S. 351, 355-57 (1976); *see, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 215, 230 (1982) (state may provide free public education to undocumented children within its jurisdiction, and may not deny them equal protection of the laws). And local criminal enforcement is a classic example of a local problem over which states and cities retain authority. *Morrison*, 529 U.S. at 618. It follows that a "state's ability to regulate its internal law enforcement activities is a quintessential police power," even where those activities relate to immigration matters. *United States v. California*, 921 F.3d 865, 887 n.11 (9th Cir. 2019) (rejecting federal preemption challenge to state law governing state and local law enforcement participation in civil immigration enforcement) (citing *Morrison*, 529 U.S. at 618); *see also DeCanas*, 424 U.S. at 355-57 (broad state police powers to regulate local problems are not abrogated or preempted simply because they affect noncitizens and undocumented immigrants).

Although federal legislation, under the Constitution's Supremacy Clause, may preempt conflicting state or local laws, courts apply a strong presumption against preemption—especially in areas of traditional state police powers. *See, e.g.*, *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995) ("[W]e have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law."). The party claiming preemption has the burden of establishing it, and courts must operate on the "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.*; *Maine Forest Products Council v. Cormier*, 51 F.4th 1, 6 (1st Cir. 2022) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)); *see also Nixon v. Missouri Municipal League*, 541 U.S. 125, 140 (2004) (courts make "working

assumption that federal legislation threatening to trench on the States' arrangements for conducting their own governments should be treated with great skepticism, and read in a way that preserves a State's chosen disposition of its [and its municipal subdivisions'] own power, in the absence of" a clear Congressional statement of intent to the contrary); *Gregory*, 501 U.S. at 460.

Courts apply this presumption with particular force when, as here, a local law regulates for health, safety, or community welfare—even if the law has incidental "'effects in the area of immigration.'" *See Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 768 (9th Cir. 2025) (quoting *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016)) (applying presumption to reject preemption challenge to state law governing wage provided to immigrant detainees); *Doe v. U.S. Immigration & Customs Enforcement*, 490 F. Supp. 3d 672, 692-93 (S.D.N.Y. 2020) (applying presumption to reject preemption challenge to state law prohibiting immigration arrests in courthouses). The Supreme Court has done the same. *See, e.g.*, *Arizona*, 567 U.S. at 400; *DeCanas*, 424 U.S. at 357-58 (applying presumption to reject preemption challenge to state law governing employment of undocumented workers). Those decisions reflect a consistent principle: when States and their localities regulate in areas of traditional police power, federal preemption requires a clear and unmistakable directive from Congress. No such directive exists here.

Boston's Trust Act fits comfortably within this tradition. As the City explained when reaffirming the Ordinance, its principal purposes are to ensure that immigrants may participate fully and equally in local civic life; to protect the civil rights, liberties, and safety of Boston residents and visitors; and to enhance the public trust in, cooperation with, and effectiveness of Boston's police force. *See* Doc. No. 1-1 (Boston Trust Act (2014)), at 2; Doc. No. 1-2 (Boston Trust Act (2019)), at 2; City of Boston, *Council Reaffirms the Trust Act* (Dec. 6, 2024),

https://perma.cc/2JC8-KFST. Federalism not only allows for such local judgments; it protects them from federal overreach and coercion.

## II.    The Ordinance Is Consistent With State And Federal Law

Plaintiff has not met its burden to allege facts showing that the Boston Trust Act is clearly preempted. *See* Doc. No. 16, at 5-16. But rather than re-trace defendants' (correct) arguments regarding the insufficiency of plaintiff's allegations, the Commonwealth here emphasizes a broader point: Boston's regulation of its own internal law enforcement practices fully comports with clear and controlling Massachusetts state law, and both that state law and the Ordinance are consistent with federal immigration law.

### A.    The Ordinance Is Consistent With Massachusetts State Law

The Ordinance is designed to ensure that City officials comply with state-law limits on local participation in civil immigration enforcement. Remaining in the United States without lawful status is generally not a crime under federal law, and removal proceedings are civil, not criminal. *Arizona*, 567 U.S. at 396, 407. In the absence of a federal statute granting state officers the power to make arrests for a federal offense, their authority to do so is a question of state law. *See United States v. Di Re*, 332 U.S. 581, 589-590 (1948); *Commonwealth v. Craan*, 469 Mass. 24, 33 (2014) ("[A]lthough the 'general rule is that local police are not precluded from enforcing federal statutes,' their authority to do so derives from State law.") (citing *Gonzales v. Peoria*, 722 F.2d 468, 474 (9th Cir.1983), overruled on other grounds by *Hodgers–Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir.1999)). And neither Massachusetts law nor federal law authorizes state and local officers to make arrests solely because federal authorities believe an individual may be subject to civil removal.

Under Massachusetts law, state and local officials generally do not have authority to arrest or detain individuals for civil immigration violations, even at the request of federal authorities

issuing immigration detainers.[4] In *Lunn*, the SJC held that Massachusetts state and local law enforcement officers have no authority under state law to arrest or detain an individual solely on the basis of a federal civil immigration detainer. 477 Mass. at 529-32, 536. Importantly, the SJC (like other courts) concluded—and the United States as amicus conceded—that immigration detainers are requests, not commands, and that compliance is voluntary, not mandatory. *Id*. at 526-527.[5] Continued detention based on a federal immigration detainer request—beyond the time an individual would otherwise be released—constitutes an arrest under Massachusetts state law, which does not grant police officers authority to make warrantless arrests for federal civil matters.[6]

---

[4] An immigration detainer is a request from a federal immigration agency, asking a state or local agency or official to hold and maintain custody of an individual—sometimes up to 48 hours beyond the date the individual would otherwise be released under state law—so federal officials can assume custody. *See* 8 C.F.R. § 287.7; U.S. Immigration and Customs Enforcement, *Immigration Detainers* (Updated: May 13, 2025), https://www.ice.gov/immigration-detainers.

[5] Federal courts agree. *See, e.g.*, *City of Philadelphia v. Attorney General of United States*, 916 F.3d 276, 281 (3rd Cir. 2019) ("A[n ICE] detainer is a *request*, not a *demand*.") (citing *Galarza v. Szalczyk*, 745 F.3d 634, 642 (3rd Cir. 2014)); *United States v. Valdez-Hurtado*, 638 F. Supp. 3d 879, 889 (N.D. Ill. 2022) ("Numerous federal courts have agreed with this Court's conclusion that the language of detainer requests, and of the governing DHS regulation, shows that detainer requests are requests and not legal commands."). Any contrary conclusion would raise serious questions about the constitutionality of such purported demands under the Tenth Amendment's anti-commandeering principle. *See Lunn*, 477 Mass. at 526-527 (citing *Galarza*, 745 F.3d at 641-42, *Printz*, 521 U.S. 898, and *New York*, 505 U.S. 144). Other state courts have also held similarly. *See State v. Lopez-Carrera*, 247 A.3d 842, 859, 245 N.J. 596, 626 (N.J. 2021); *Ramon v. Short*, 460 P.3d 867, 873, 399 Mont. 254, 265 (Mont. 2020).

[6] Under Massachusetts common law, police officers may make warrantless arrests only if: (1) they have probable cause to believe an individual has committed a felony, *see Commonwealth v. Gernrich*, 476 Mass. 249, 253 (2017); *Commonwealth v. Hason*, 387 Mass. 169, 173 (1982); or (2) an individual commits a misdemeanor that amounts to a breach of the peace in the officer's presence and is ongoing at the time of the arrest, *Commonwealth v. Jewett*, 471 Mass. 624, 629-30 (2015); *Commonwealth v. Howe*, 405 Mass. 332, 334 (1989). Both narrow exceptions contemplate criminal offenses and do not grant authority to arrest for a civil immigration matter. Although some state statutes allow for limited noncriminal detention of an individual, none of them authorize the detention of individuals based solely on federal civil immigration detainers. *See Lunn*, 477 Mass. at 531-32 (surveying Massachusetts statutes).

*Id.* at 527. Therefore, such arrests by state and local officials—even at federal requests—are unlawful in Massachusetts, and any police officers or local officials holding an individual in custody solely due to an immigration detainer would be violating state law. *Id.* at 527-32, 537.

The Ordinance mirrors *Lunn*'s requirements. *Compare* Doc. No. 1-2, at 3-5 (Sections 2 and 4(a)). It is closely focused on ensuring that Boston law enforcement officers do not take actions that state law forbids. As explained *infra*, none of the Ordinance's restrictions, nor the state laws with which they are intended to comply, conflict with federal law.

### B. Neither Massachusetts State Law Nor The Ordinance Conflicts With Federal Immigration Law

Nothing in Massachusetts law—or in the Ordinance—conflicts with 8 U.S.C. §§ 1357, 1373, or 1644. Sections 1373 and 1644 govern only the sharing of "information regarding the citizenship or immigration status" of an individual. They say nothing about local limitations on arrests, detentions, or cooperation with civil detainer requests. Because the Massachusetts law set forth in *Lunn* is limited to state and local authority to arrest individuals pursuant to federal civil immigration detainer requests, it does not implicate the information-sharing provisions in 8 U.S.C. §§ 1373 or 1644. And the Ordinance includes no provisions prohibiting or restricting the sharing of "information regarding the citizenship or immigration status" of any individual, which is what those statutes bar. *See* 8 U.S.C. §§ 1373 and 1644.

Federal law reinforces this division of authority. Section 1357(g) *permits*, but does not *require*, state or local officers to perform immigration-officer functions under written agreements that must be "consistent with State and local law." 8 U.S.C. § 1357(g)(1).[7] And while

---

[7] Thus, any written agreements under § 1357(g)(1) would not confer on state or local officials authority to take enforcement actions that would violate state law. *See Lunn*, 477 Mass. at 534. In any event, it is undisputed that the City of Boston has no such agreements with the federal government, and plaintiff does not allege or suggest otherwise.

§ 1357(g)(10) likewise permits certain limited cooperation even without such written agreements, nothing in the statute requires it or overrides state-law limits on officers' arrest authority. *See New York*, 2025 WL 3205011, at *15 (courts "have consistently found that similar state and local policies, which withhold state cooperation for federal immigration enforcement activities, are not preempted by" § 1357(g)); *Lunn*, 477 Mass. at 535 (analyzing § 1357(g)). Thus, the federal immigration statutory scheme (including the key provisions cited in the complaint) affords due respect and effect to state and local law, governments, and officials. Congress created a voluntary system of cooperation; it did not conscript state and local officers into federal immigration enforcement.

Consistent with that framework, the Ordinance includes carveouts to ensure that City law enforcement officials are not prohibited from taking certain actions. Doc. No. 1-2, at 5-6 (Section 4(b)). For example, the Ordinance does not prohibit officials from taking various enforcement actions, including responding to federal requests for information about an individual's criminal history (where otherwise permitted by state law) or participating in federal law enforcement partnerships or task forces (as long as the primary purpose is not civil immigration enforcement). *Id.* And, critically, the Ordinance expressly states that it "does not prohibit or restrict any government agency from complying with Sections 1373 and 1644 of Title 8 of the United States Code." *Id.* at 6 (Section 4(c)). The Ordinance thus goes out of its way to avoid any possible conflict with those statutes.

Moreover, federal courts interpreting sections 1373 and 1644 have consistently read them narrowly and rejected claims similar to those the United States is pressing here. *See New York*, 2025 WL 3205011, at *6-16 ("Courts have consistently upheld similar information-sharing restrictions against conflict preemption challenges."); *Illinois*, 2025 WL 2098688, at *9-11

11

(holding similarly and collecting cases); *see also* Doc. No. 16, at 2-3, 11-15. For example, in the *Illinois* case, the federal government challenged Illinois laws at the state, county, and city level that restrict state and local cooperation with federal civil immigration enforcement, including compliance with detainers and certain communication and information sharing with federal immigration authorities. *Illinois*, 2025 WL 2098688, at *2. In dismissing the federal government's complaint, the district court concluded that the statutes and ordinances regarding information sharing were *not* preempted by the INA because the challenged laws did not restrict the sharing of a detained individual's immigration status, which is the only thing prohibited by § 1373. *Id.* at *13. Furthermore, the court found that the laws do not "pose an obstacle" to the INA (as would be required to allege conflict preemption), because they do not make ICE agents' job more difficult; they simply do not make the job easier, which is consistent with the INA's invitation to states to assist ICE, without any mandate for them to do so. *Id.* at *21. Nor did the state and local policies unlawfully discriminate against or regulate the federal government—to the contrary, those policies prohibiting participation in the enforcement of civil immigration law represented, the court found, "a decision protected by the Tenth Amendment." *Id.* at *27.

Similarly, in *New York*, the United States challenged a state law limiting warrantless civil arrests at state court proceedings, as well as two executive orders restricting both warrantless immigration arrests within state facilities and certain information sharing for the purpose of federal civil immigration enforcement (with necessary exceptions). *New York*, 2025 WL 3205011, at *3-5. In granting New York's motion to dismiss, the district court recognized that "[s]ettled federalism principles and the Tenth Amendment generally empower the States to control the use of their own facilities, manage their internal affairs, and direct the control of their officials without federal

interference." *Id.* at \*13. In the court's reading, the federal government's complaint "ma[d]e plain its desire to commandeer New York's resources to aid in federal immigration efforts." *Id.* at \*19.

This lawsuit is much the same. The federal administration cannot compel local governments and commandeer their resources to support its policies; it may prefer that cities actively assist its civil immigration enforcement priorities, but that preference has no legal force. While the federal administration may dislike that Boston (like New York, Chicago, and others) has chosen policies that do not affirmatively facilitate its priorities, "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." *Kansas v. Garcia*, 589 U.S. 191, 212 (2020) (holding immigration-related state criminal law not preempted); *see New York*, 2025 WL 3205011, at \*15 ("[T]he United States fails to identify any federal law mandating that state and local officials generally assist or cooperate with federal immigration enforcement efforts. Nor could it. No such federal laws exist because the Tenth Amendment prohibits Congress from conscripting state and local officials and resources to assist with federal regulatory schemes, like immigration enforcement."). This Court should hold, as other courts have in similar circumstances, *id.* at \*14-20; *Illinois*, 2025 WL 2098688, at \*16-18, \*23-27, that plaintiff's complaint fails to state any plausible claim for relief under the Supremacy Clause.

## III. The Ordinance Is Supported By Strong Governmental Interests

Massachusetts has a strong interest in supporting its noncitizen population. Noncitizen residents contribute substantially to the Commonwealth's economic, cultural, and intellectual vitality. They generate significant tax revenue, fill critical workforce gaps, and start businesses that create jobs. Nearly one million immigrant residents live in the Boston metropolitan area alone,

making invaluable contributions to their communities.[8] The Ordinance is but one way Boston can support its immigrant community, as it strengthens public safety and public health and preserves the City's resources.

### A.      The Ordinance Improves Public Safety

Boston's policy of limiting local officers' participation in federal civil immigration enforcement serves an essential public-safety interest: it fosters trust and cooperation between immigrant communities and the police. The Ordinance reflects the City's considered judgment—shared by law enforcement leaders and social scientists alike—that local policing depends on the confidence of the communities it serves. By decoupling immigration enforcement from local policing, the Ordinance ensures that every Boston resident—regardless of immigration status—can report crimes, serve as witnesses, and seek police assistance without fear that doing so will lead to deportation or other immigration consequences for themselves or loved ones. That clarity matters. When people know that seeking protection will not put their families at risk, they speak up, enabling the police to solve crimes and keep neighborhoods safe.

Empirical research confirms a truth long recognized by police chiefs across the country: when immigrants believe a call to the police could lead to immigration consequences, they keep their distance. In one study, fully half of immigrants—and over two-thirds of undocumented

---

[8] See American Immigration Council, *New Americans in the Boston Metro Area* (2023), https://map.americanimmigrationcouncil.org/city/boston/ (last visited Nov. 21, 2025). See also Americans for the Arts, *Arts Impact Explorer Fact Sheet: Arts + Immigration* (July 2024), https://ww2.americansforthearts.org/sites/default/files/2025-1/Arts%20%2B%20Immigration.pdf (a majority of Americans believe that immigrants improve the quality of the food, music and arts in the United States); Aidan Enright, et al., *International Students: Poorly Suited Immigration Pathways Stymie Formation of High Growth Businesses* 4, Pioneer Institute, (July 2024), https://files.eric.ed.gov/fulltext/ED656349.pdf ("A significant body of research has found that immigrants are more likely to start businesses than those born in the U.S., and the propensity of international students to concentrate in STEM fields indicates enormous potential for economic contributions.").

immigrants—said they would be less inclined to report crimes or provide information to police if they believed officers would ask about immigration status.[9] That kind of fear is a gift to criminals and a threat to public safety. As Boston's Police Commissioner has explained, the City's message to residents is clear: "[W]e don't care about your immigration status. What we do care about is are you a victim of crime in our city, or are you a victimizer? We still hold you accountable for that, no matter what your immigration status is."[10]

Local and national law enforcement leaders agree that public safety suffers when immigrant communities are afraid to engage with the police. One police chief warned that if immigrants cannot approach officers without hesitation, "you create a shadow population" of victims who "become prey for human predators … because they know [these victims] won't contact the police."[11] Indeed, "[c]riminals thrive in neighborhoods where people don't trust the police," and widespread reluctance to report crimes is "a much greater public safety problem" than the presence of undocumented residents who are otherwise law-abiding.[12] That insight is shared at the national level. The President's Task Force on 21st Century Policing—a national panel of police chiefs, criminologists, and community-policing experts—recommended "decoupl[ing]" federal immigration enforcement from routine local policing as a best practice for building community trust, just as Boston has attempted to do.[13] In the Task Force's words, "[l]aw enforcement agencies should build relationships based on trust with immigrant communities"

---

[9] Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* 5-6 (2013).

[10] Lauren Keenan, *Boston police commissioner says dept. does not enforce federal immigration law*, Straight Arrow News (Feb. 18, 2025).

[11] Steve Lopez, *LAPD Chief Beck Explains Why He Doesn't Want His Officers to Be Immigration Cops*, L.A. Times (Jan. 28, 2017).

[12] Pamela Constable, *For Immigrant Women, Domestic Violence Creates a Double Shadow*, Wash. Post (Dec. 2, 2013)

[13] The President's Task Force on 21st Century Policing, Final Report 18 (2015).

because "[t]his is central to overall public safety."[14] As a result, the Task Force concluded that "whenever possible, state and local law enforcement should not be involved in immigration enforcement."[15] The Ordinance hews directly to this sound guidance. By removing the threat of immigration consequences from ordinary policing, the City ensures that victims and witnesses can come forward without fear, thereby strengthening the trust, cooperation, and safety of every neighborhood in Boston.

Social science strongly supports the safety benefits of policies like Boston's. When local police assist in federal civil immigration enforcement, immigrant communities withdraw, becoming more isolated and less willing to report crimes,[16] which in turn makes them more vulnerable to violence, exploitation, and abuse.[17] In fact, a comprehensive study comparing jurisdictions across the country found that Latino residents were significantly more likely to report being victims of violent crime in jurisdictions with laws limiting local law enforcement's involvement in civil immigration enforcement (like Boston) than in places without such policies. The researchers calculated that if such trust-promoting policies had been in effect nationwide, over 90,000 additional violent crimes would have been reported to the police during the study period— a striking indication of how fear of immigration consequences keeps victims silent.[18] Another

---

[14] *Id.*

[15] *Id.*

[16] *See, e.g.*, Nik Theodore & Robert Habans, *Policing Immigrant Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, 42 J. Ethnic & Migration Stud. 970, 971 (2016).

[17] *See, e.g.*, Elizabeth Fussell, *The Deportation Threat Dynamic and Victimization of Latino Migrants: Wage Theft and Robbery*, 52 Socio. Q. 593, 610 (2011) (describing how labor exploitation increases when migrant workers fear that interaction with police may result in deportation).

[18] Ricardo D. Martínez-Schuldt & Daniel E. Martínez, Immigration Sanctuary Policies and Crime-Reporting Behavior: A Multilevel Analysis of Reports of Crime Victimization to Law Enforcement, 1980 to 2004, 86 Am. Socio. Rev. 154, 170 (2021).

study examined crime data during a period of intensified federal immigration enforcement and found that, in 2017, crime reporting dropped significantly in areas with large Hispanic populations, but *not* in counties that had adopted policies limiting local law involvement in immigration enforcement. And because the researchers ruled out any decrease in crime occurrence as the cause of reduced reporting, the cause was clear: fear of immigration consequences was driving victims and witnesses into the shadows.[19]

Notably, research finds no evidence that policies like those in Boston lead to increased crime. On the contrary, by encouraging cooperation and trust, these policies may *reduce* crime and improve overall public safety. Criminologists describe this as a "spiral of trust" in which community confidence in police encourages reporting, which in turn deters criminal activity.[20] The data bear this out. Multiple studies have thus found either no uptick in crime or an actual decrease in jurisdictions that limit cooperation with civil immigration enforcement. For instance, a 2022 county-level analysis concluded that such policies were linked with reductions in both property and violent crime.[21] Another study found that, on average, jurisdictions that limit cooperation with civil immigration enforcement experience lower crime rates and stronger economies than comparable jurisdictions without such policies.[22] In short, Boston's approach does

---

[19] *See* Reva Dhingra et al., *Immigration Policies and Access to the Justice System: The Effect of Enforcement Escalations on Undocumented Immigrants and Their Communities*, 44 Pol. Behav. 1359, 1361 (2022).

[20] Daniel E. Martínez et al., *Providing Sanctuary or Fostering Crime? A Review of the Research on "Sanctuary Cities" and Crime*, 12 Socio. Compass e12547, at 7-10 (Jan. 2018) (surveying the literature).

[21] Marta Ascherio, *Do Sanctuary Policies Increase Crime? Contrary Evidence from a County-Level Investigation in the United States*, 106 Soc. Sci. Research 102743 (Aug. 2022).

[22] Tom K. Wong, Ctr. For Am. Progress, *The Effects of Sanctuary Policies on Crime and the Economy* (Jan. 26, 2017).

not compromise public safety—if anything, it enhances it by bolstering trust, which in turn helps the police prevent crime, solve crimes, and keep neighborhoods safe.

**B.      The Ordinance Improves Public Health**

The Ordinance also advances public health and general welfare by reducing the climate of fear that too often pervades immigrant communities. Studies have documented that immigrants often refrain from accessing other vital services, in addition to police assistance, if they believe that local authorities might report them to immigration officials.[23] The consequences of this fear can be devastating. In one tragic example, a young child died after his parents delayed seeking emergency medical treatment because they feared hospital staff would alert immigration authorities.[24] The broader public bears the consequences. When members of a community avoid hospitals, schools, or other critical services due to immigration-related fears, everyone's health and safety is put at risk. The COVID-19 pandemic made that point undeniable: if individuals shy away from either healthcare or vaccination out of mistrust or fear, communicable diseases can spread unchecked and endanger the community at large. The Ordinance improves public health and community well-being, ensuring that no segment of the population is driven underground because of immigration status.

---

[23] *See, e.g.,* Omar Martinez et al., *Evaluating the Impact of Immigration Policies on Health Status Among Undocumented Immigrants: A Systematic Review*, 17 J. Immigr. Minor. Health 947, 964 (2015); Scott D. Rhodes et al., *The Impact of Local Immigration Enforcement Policies on the Health of Immigrant Hispanics/Latinos in the United States*, 105 Am. J. Pub. Health 329, 332 (2015).
[24] Elizabeth M. McCormick, *Federal Anti-Sanctuary Law: A Failed Approach to Immigration Enforcement and a Poor Substitute for Real Reform*, 20 Lewis & Clark L. Rev. 165, 199 (2016).

C.       **The Ordinance Preserves Scarce Local Resources**

Boston's law enforcement officers are already tasked with combating violent crime, responding to emergencies, and engaging in community policing; forcing them to also serve as immigration agents would overload local agencies and detract from these critical responsibilities. In effect, conscripting local police for civil immigration enforcement—aside from being unconstitutional, as explained *supra*—would also drain resources.[25] Studies have found that honoring federal immigration detainer requests can impose substantial costs on state and local governments, running into the tens of millions of dollars annually in some states.[26] These costs siphon resources away from things like crime prevention, drug treatment, and other programs that keep cities safe—and are well within state and local governments' core sovereign interests to prioritize. By keeping the City's police officers within the bounds of their lawful authority, the Ordinance also shields the City from legal and financial risks. Jurisdictions that have honored ICE detainers or otherwise engaged in unauthorized immigration arrests have faced costly lawsuits and damage awards.[27] Especially given Massachusetts law's clear limits on civil immigration detentions, the Ordinance wisely ensures that Boston's taxpayer funds and police manpower are focused on local public safety needs, not diverted to subsidize counterproductive and cruel federal immigration agendas.

\*       \*       \*

---

[25] *See* Pratheepan Gulasekaram et al., *Anti-Sanctuary and Immigration Localism*, 119 Colum. L. Rev. 837, 865-66 & n.169 (2019).

[26] *See* Alexandra Sirota & Lissette Guerrero, Budget & Tax Ctr., N.C. Ctr. for Just., *Local Communities Face High Costs of Federal Immigration Enforcement* 4-5 (Apr. 2019).

[27] *See e.g., Allegheny County Settles Lawsuit Involving US Citizen Illegally Detained by ICE*, ACLU Pennsylvania (Nov. 18, 2015). *See also* Major Cities Chiefs Association, Immigration Policy (citing possible "liability for unlawful arrest and detention" as a reason for jurisdictions to avoid "civil immigration enforcement by local police officers").

The Ordinance is not only lawful; it is sound public policy. It builds the trust that lets police do their jobs, protects immigrant residents, improves public safety and public health, and directs limited resources to help the City (rather than to unfunded federal tasks that would erode community confidence). That is exactly what local government is supposed to do. And given the clear limits that state law places on civil immigration detentions, the Ordinance is both well-justified and firmly within Boston's authority. The Ordinance is a legitimate exercise of the City's police powers, and the federal government's challenge provides no basis to set it aside.

## CONCLUSION

For the foregoing reasons, this Court should grant defendants' motion to dismiss.

Respectfully submitted,

THE COMMONWEALTH OF
MASSACHUSETTS

By and through its attorneys,


ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of Massachusetts*

/s/ *Jared B. Cohen*
Tasha J. Bahal, BBO No. 675935
  *Deputy State Solicitor*
Elizabeth D. Matos, BBO No. 671505
  *Chief, Civil Rights Division*
David R. Rangaviz, BBO No. 681430
Jared B. Cohen, BBO No. 689217
Isabelle Longfellow, BBO No. Pending
  *Assistant Attorneys General, Civil Rights Division*
One Ashburton Place
Boston, MA 02108
(617) 963-2833
jared.b.cohen@mass.gov

20

## <u>CERTIFICATE OF SERVICE</u>

I, Jared B. Cohen, hereby certify that I have this day, November 24, 2025, served the foregoing document upon all parties of record, by electronically filing to all ECF-registered parties and by sending a copy, first-class mail, postage prepaid to all unregistered parties.

/s/ *Jared B. Cohen*
Jared B. Cohen