## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE CITY OF BOSTON; MICHELLE WU, Mayor of the City of Boston, in her Official Capacity; BOSTON POLICE DEPARTMENT; MICHAEL A. COX, Police Commissioner, in his Official Capacity,<br><br>Defendants. | Civil Action No. 1:25-cv-12456-LTS |

**[PROPOSED] BRIEF OF *AMICI CURIAE***
**LAW ENFORCEMENT OFFICIALS IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE PLAINTIFF'S COMPLAINT**

Austin P. Anderson (BBO #696414)
ANDERSON & KREIGER LLP
50 Milk Street, 21st Floor
Boston, Massachusetts 02109
(617) 621-6500
aanderson@andersonkreiger.com

Ames Grawert (*pro hac vice* pending)
Brianna Seid (*pro hac vice* pending)
BRENNAN CENTER FOR JUSTICE
120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8310
grawerta@brennan.law.nyu.edu
seidb@brennan.law.nyu.edu

*Attorneys for Amici Curiae*
*Law Enforcement Officials*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ............................................................................................... ii

STATEMENT OF INTEREST ........................................................................................... 1

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ...................................................................................................................... 3

     I.     Experience and Research Show that the Act Advances Public Safety. ................. 4

           A.     Burdening Local Police with Immigration Enforcement Undermines Public Safety and Reduces Trust. ............................................................ 5

           B.     Local Entities Are Best Positioned to Determine How to Use Local Resources. ............................................................................................... 9

     II.    The Boston Trust Act Allows Local Law Enforcement to Pursue Local Interests, and Federal Law Enforcement to Pursue Federal Interests. ................. 11

CONCLUSION .................................................................................................................. 14

# TABLE OF AUTHORITIES

**Cases**                                                                                       **Page(s)**

*City of Chi. v. Sessions*,
   888 F.3d 272 (7th Cir. 2018) ...........................................................................3, 12

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
   584 U.S. 453 (2018)...........................................................................................13

*New York v. U.S. Immigr. & Customs Enf't*,
   466 F. Supp. 3d 439 (S.D.N.Y. 2020)..................................................................4

*Printz v. United States*,
   521 U.S. 898 (1997)...........................................................................................13

*United States v. New Jersey*,
   2021 WL 252270 (D.N.J. Jan. 26, 2021) ...........................................................12

**Statutes**

Boston Trust Act ................................................................................................. *passim*

**Other Authorities**

Benjamin O'Brien et al., *The Politics of Refuge: Sanctuary Cities, Crime, and
   Undocumented Immigration*, 55 URBAN AFFAIRS REVIEW 1 (2019)................................8

*Best Practices for Law Enforcement to Preserve Community Trust in the Context
   of Increased Immigration Enforcement,* Law Enf't Immigr. Task Force (Dec.
   23, 2024), Ctr. for Preventive Action, https://leitf.org/2024/12/best-practices-
   for-law-enforcement-to-preserve-community-trust-in-the-context-of-
   increased-immigration-enforcement ..................................................................6

Boston City Council, *Resolution 2024-1788*, Boston Granicus,
   https://boston.granicus.com/player/clip/10154?view_id=1&meta_id=72395&r
   edirect=true ......................................................................................................12

Bridgette Adu-Wadier, *How the FBI Works With Local Law Enforcement to
   Respond to Violent Crime*, WTTW (Sept. 2, 2025, at 19:28 CST),
   https://news.wttw.com/2025/09/02/how-fbi-works-local-law-enforcement-
   respond-violent-crime ......................................................................................11

Camilo Montoya-Galvez, *ICE's detainee population reaches 66,000, a new
   record high, statistics show*, CBS News (Nov. 6, 2025),
   https://www.cbsnews.com/news/ices-detainee-population-reaches-66000-a-
   new-record-high-statistics-show/ ......................................................................7

**Other Authorities**                                                                 **Page(s)**

*Council Reaffirms the Trust Act,* City of Boston, Dec. 6, 2024, https://www.boston.gov/news/council-reaffirms-trust-act ......................................................12

David J. Bier, *65 Percent of People Taken by ICE Had No Convictions, 93 Percent No Violent Convictions*, Cato Inst. (June 20, 2025), https://www.cato.org/blog/65-people-taken-ice-had-no-convictions-93-no-violent-convictions..............................................................................................................7

*Do 287(g) Agreements with ICE Make Communities Safer?*, Am. Immigr. Council (July 18, 2024) .......................................................................................................................5

*Effects of Federal Funding Cuts on Public Safety*, Brennan Ctr. for Just., https://www.brennancenter.org/series/effects-federal-funding-cuts-public-safety ..................................................................................................................................9

*Fear and Silence: 2025 Insights from Advocates for Immigrant Survivors,* All. For Immigrant Survivors (June 18, 2025), https://www.immigrantsurvivors.org/2025-insights-from-advocates-for-immigrant-survivors..................................................................................................................6

*Heath Street Gang Members and Associates Charged in Federal Sweep,* U.S. Att'y's Off., Dist. of Mass. (Feb. 14, 2024), https://www.justice.gov/usao-ma/pr/heath-street-gang-members-and-associates-charged-federal-sweep ...........................10

JB Pritzker, *Written Testimony to the U.S. House Committee on Oversight and Accountability,* U.S. House of Representatives (June 12, 2025), https://oversight.house.gov/wp-content/uploads/2025/06/Pritzker-Written-Testimony.pdf ..........................................................................................................................10

Kelly A. Yotebieng et al., *It Takes More than Translating a Flier: Considerations in Serving Immigrants as Victims of Crime in a Large Midwestern City*, 8 Border Crossing 12 (2018)..................................................................................................7

Law Enforcement Immigration Task Force & Police Executive Research Forum, *Building Trust with Immigrant Communities*, Police Executive Research Forum (2020) ...................................................................................................................6

Loren Collingwood & Benjamin Gonzalez O'Brien, *Sanctuary Cities: the politics of refuge* 118 (Oxford Academic, 2019)..................................................................6

Marta Ascherio, *Do Sanctuary Policies Increase Crime? Contrary Evidence from a County-Level Investigation in the United States,* 106 Soc. Sci. Research (2022)...................................................................................................................................8

**Other Authorities**                                                                          **Page(s)**

Mary Spiro, *Sociological Research Reveals How Immigrants Can Reduce Crime,*
  Am. Socio. Ass'n (Oct. 31, 2025), https://www.asanet.org/sociological-
  research-reveals-how-immigrants-can-reduce-crime ..................................................8

*Multi-Agency Task Force Leads to Arrest,* City of Albuquerque (May 2, 2022),
  https://www.cabq.gov/police/news/multi-agency-task-force-leads-to-arrest .........................11

Nancy Morawetz & Alina Das, *Legal Issues in Local Police Enforcement of
  Federal Immigration Law*, The Role of Local Police: Striking a Balance
  Between Immigration Enforcement & Civil Liberties 69 (2009)..........................................10

Nicola Delvino & Markus González Beilfuss, *Latino Migrant Victims of Crime:
  Safe Reporting for Victims with Irregular Status in the United States and
  Spain*, 65 Am. Behavioral Scientist 1193 (2021) ....................................................8

Nik Theodore & Robert Habans, *Policing Immigrant Communities: Latino
  Perceptions of Police Involvement in Immigration Enforcement*, 42 J. Ethnic
  & Migration Studies 970 (2016) .....................................................................7

*Instability in the Northern Triangle*, Council on Foreign Relations (Sep. 19,
  2025), https://www.cfr.org/global-conflict-tracker/conflict/violent-instability-
  northern-triangle ...................................................................................6

Robert C. Davis & Nicole J. Henderson, *Willingness to Report Crimes: The Role
  of Ethnic Group Membership and Community Efficacy*, 49 Crime &
  Delinquency, 564 (2003) ............................................................................6

Seth Hoy, *Illinois County "Just Says No" to Costly Immigration Detainers,* Am.
  Immigr. Council (Sept. 14, 2011),
  https://www.americanimmigrationcouncil.org/blog/illinois-county-"just-says-
  no"-to-costly-immigration-detainers/ ................................................................9

Susannah N. Tapp & Emilie J. Cohen, Criminal Victimization, 2024, U.S. Dep't
  of Justice (Sept. 2025), https://bjs.ojp.gov/document/cv24.pdf.......................................6

*Thirty Charged in Sweeping Federal Case Targeting Tren de Aragua Members
  and Associates for Drug Trafficking, Murder-for-Hire, and Firearms Crimes,*
  U.S. Atty's Off, Dist. of Colo. (Aug. 18, 2025),
  https://www.justice.gov/usao-co/pr/thirty-charged-sweeping-federal-case-
  targeting-tren-de-aragua-members-and-associates ...................................................11

Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Ctr.
  Am. Progress (2017), https://www.americanprogress.org/article/the-effects-of-
  sanctuary-policies-on-crime-and-the-economy/ ...................................................4, 9

**Other Authorities**                                                   **Page(s)**

Tom K. Wong, *The Impact of Interior Immigration Enforcement on the Day-to-Day Behaviors of Undocumented Immigrants*, Ctr. Am. Progress (2017), https://usipc.ucsd.edu/publications/usipc-working-paper-1.pdf ............................................5, 8

*US: Immigrants 'Afraid to Call 911'*, Hum. Rts. Watch (May 14, 2014 at 23:55 EDT), https://www.hrw.org/news/2014/05/14/us-immigrants-afraid-call-911 ........................6

## STATEMENT OF INTEREST

This brief is respectfully submitted on behalf of law enforcement officials who have spent their careers working to keep communities and residents safe.[1]

Amici have experience in roles across the criminal justice system; many have spent decades in leadership positions in policing, prosecution, and corrections around the country. They have witnessed firsthand the value of community trust in preserving public safety, as well as the critical importance of having a clear division of responsibilities between local and federal law enforcement. Amici's experience bears directly on questions of law and policy before the Court, such as the nature and gravity of a city's interest in allocating its resources and encouraging individuals to report crimes without fear of repercussions. Amici therefore aim to assist the Court by providing their real-world perspective on these questions based on their years of law enforcement experience.

## PRELIMINARY STATEMENT

Law enforcement professionals depend on the trust of the communities they serve. It is the glue that holds the criminal justice system together. Without trust, victims and witnesses will not come forward to report crimes to police. They will be reluctant to cooperate with prosecutors, hindering prosecutors' ability to collect and present the best possible evidence. And they will hesitate to enter courthouses to give testimony against people who have wronged them. As a result, actions that undermine trust between communities and law enforcement also undermine the ability of law enforcement professionals to do their jobs and keep their communities safe.

---

[1]    No party or party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund the preparation or submission of this brief. A list of all amici is provided at Appendix A.

As law enforcement professionals, amici know firsthand that decisions about how to allocate local resources to advance local goals for public safety and crime prevention are best made by those who know their communities. Well-crafted laws defining the ways in which local law enforcement will participate in federal immigration enforcement further such public safety goals.

To strike what they believe to be the appropriate balance for their communities, cities around the country have passed laws and issued policies specifying the degree to which they will take on federal immigration enforcement responsibilities. These are not one-size-fits-all policies. Rather, they are grounded in judgments about how to keep particular communities safe, judgments that are best made by those who are closest to those communities. They allow federal law enforcement to continue to pursue federal priorities. And they rest on sound research and the experience of law enforcement professionals; allowing cities to decide how to efficiently allocate their resources in light of their specific personnel and experience.

The Boston Trust Act (the "Act") is one such law. It circumscribes the degree to which Boston officials will, for the sole purpose of civil immigration enforcement, honor non-judicial holds for immigration authorities (ICE "detainers") or collect immigration-related information about people they interact with while carrying out their law enforcement mission. As amended in 2019, the Act provides:

> A law enforcement official shall not detain an individual solely on the basis of a civil immigration detainer request or an ICE administrative warrant after the individual is eligible for release from custody, unless ICE has a criminal warrant, issued by a judicial officer, for the individual.

Compl. Ex. 2 (Trust Act 2019) at § 2, ECF No. 1-2. The Act also requires transparent annual reporting from the Boston Police Commissioner, and provides that local law enforcement and city personnel will not "[u]se agency or department moneys or personnel to interrogate, detain, or arrest persons for immigration enforcement purposes, that are otherwise the responsibility of the federal

2

Immigration and Customs Enforcement agency," or "[t]ransfer an individual to immigration authorities unless authorized by a judicial warrant or other judicial order." *Id.* at §§ 3-4(a).

The Act represents city leaders' judgment about how best to protect the safety of all Bostonians in a way that is consistent with available data and the experience of amici as law enforcement professionals. Amici therefore support the Defendants' Motion to Dismiss Plaintiff's Complaint, ECF No. 15 ("MTD").

## ARGUMENT

The Act is a local policy that limits how much local law-enforcement will assist federal immigration authorities by, for example, sharing information beyond the requirements of federal law or honoring ICE detainers. The Act does not stop federal officers from enforcing federal immigration laws, but instead simply defines the extent of local involvement. It is a vital tool for protecting local interests and ensuring that local police, prosecutors, and corrections officials are seen as neutral guardians of public safety. Fundamentally, its purpose is to clearly set out how local resources will be used to further local priorities, while allowing federal resources to go towards federal priorities.

In other words, the Act does not hinder law enforcement, as the Complaint claims. *See, e.g.*, Compl. ¶¶ 4-6, 8, 42-45, 49-51. Nor does it immunize undocumented immigrants from federal law enforcement, prevent federal law enforcement from pursuing immigration enforcement actions, or prevent local law enforcement from working with federal law enforcement to ensure that those who commit crimes are held responsible for their actions. *See City of Chi. v. Sessions*, 888 F.3d 272, 281 (7th Cir. 2018) (noting the extent of cooperation between federal immigration enforcement and local authorities notwithstanding local policies), *reh'g en banc granted in part, vacated in part on other grounds*, 2018 WL 4268817 (7th Cir. June 4, 2018), *vacated to same extent*, 2018 WL 4268814 (7th Cir. Aug. 10, 2018).

Instead, policies like the Act promote public safety by allowing local resources to be spent on local priorities, and by preserving the essential trust between local law enforcement and the communities that they serve. That trust increases the likelihood that victims and witnesses will come forward. Without the community's trust, it is harder for police and prosecutors to reach and work with witnesses, who may come to view law enforcement and government spaces, such as courtrooms, with trepidation. *See, e.g.*, *New York v. U.S. Immigr. & Customs Enf't*, 466 F. Supp. 3d 439, 443-44 (S.D.N.Y. 2020), *vacated on other grounds* 2023 WL 2333979 (2d Cir. Feb. 28, 2023) (noting that plaintiffs "offered substantial evidence" that non-citizen litigants may fear participation in the legal system, even reporting domestic violence, litigating family court actions, and defending themselves from criminal charges). These policies also support law enforcement by allowing local agencies to focus their limited resources on their most pressing threats, including violent crime, rather than entangling officers in federal immigration enforcement responsibilities that fall outside their training and divert them from other public safety priorities. And jurisdictions that implement such policies report stronger community cooperation and improved crime-fighting outcomes. *See, e.g.*, Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Ctr. Am. Progress (2017), https://www.americanprogress.org/article/the-effects-of-sanctuary-policies-on-crime-and-the-economy/ (concluding that counties with policies akin to the Act have statistically lower rates of crime and stronger economies than comparable counties without them).

## I.     Experience and Research Show that the Act Advances Public Safety.

The Complaint characterizes the Act as a threat to public safety. *See, e.g.*, Compl. ¶¶ 2, 8. That is inconsistent with amici's experience as law enforcement professionals, which instead supports the policy judgment that Boston made. The benefit to public safety of laws like the Act has been borne out in jurisdictions across the country: promoting trust in government, easing

burdens on victims to report crimes or abuse, facilitating the availability of witnesses and access to courthouses, and lessening the incentives to commit crimes against immigrant communities.

    **A.**    **Burdening Local Police with Immigration Enforcement Undermines Public Safety and Reduces Trust.**

The Act serves primarily to foster trust in law enforcement, trust that is in turn critical for effective policing. For this reason, the Act prohibits officers from collecting certain immigration-related information from people they interact with, ensuring that routine interactions with law enforcement do not become de facto immigration screenings. Local police and prosecutors rely on witnesses and victims—regardless of their immigration status—to report crimes when they occur and to cooperate in efforts to bring perpetrators to justice. Put simply, police cannot protect the community from, and prosecutors cannot prosecute, crimes that they do not know about. Lower crime reporting rates and cooperation with law enforcement place the entire community at risk by inhibiting law enforcement's ability to identify and respond to threats to public safety. *See, e.g.*, *Do 287(g) Agreements with ICE Make Communities Safer?*, Am. Immigr. Council (July 18, 2024) ("When immigrants don't report crimes . . . it makes communities and all their residents less safe."); Tom K. Wong, *The Impact of Interior Immigration Enforcement on the Day-to-Day Behaviors of Undocumented Immigrants*, U.S. Immigr. Pol'y Ctr. (April 3, 2019), at 17, https://usipc.ucsd.edu/publications/usipc-working-paper-1.pdf. ("To the extent that people, undocumented or not, are less likely to report crimes that they witness, let alone are victims of, to the police, serious public safety implications can result."). By keeping immigration enforcement separate from local policing, the Act helps build trust so that community members feel safe coming forward when they witness or experience crime.

In amici's experience as law enforcement professionals, fostering the community's trust in law enforcement is critical to improving crime reporting rates. This is an area where there is

significant room for progress. According to a leading federal survey, less than half of all non-fatal violent crimes were reported to police in 2024. Susannah N. Tapp & Emilie J. Cohen, *Criminal Victimization*, 2024, U.S. Dep't of Justice (Sept. 2025), at 7, https://bjs.ojp.gov/document/cv24.pdf. The figure was even lower for property crimes: less than a third of thefts made it to the attention of law enforcement in 2024. *Id.*

These problems are even more salient in immigrant communities. Law enforcement often faces an uphill battle when building trust with immigrants, many of whom come from countries where police are often ineffective, corrupt, or routinely participate in political violence. *See, e.g.*, *Best Practices for Law Enforcement to Preserve Community Trust in the Context of Increased Immigration Enforcement*, Law Enf't Immigr. Task Force (Dec. 23, 2024); *Instability in the Northern Triangle*, Council on Foreign Relations (Sep. 19, 2025), https://www.cfr.org/global-conflict-tracker/conflict/violent-instability-northern-triangle. And research consistently shows that reporting rates are lower in immigrant communities, where residents may fear that contacting the police or cooperating with prosecutors will lead to detention or deportation regardless of their criminal history (or lack thereof).[2] That fear is not unfounded: the federal government's current

---

[2]     *See, e.g.*, Loren Collingwood & Benjamin Gonzalez O'Brien, *Sanctuary Cities: the politics of refuge* 118 (Oxford Academic, 2019) (finding that provisions similar to the Act have no negative effect on crime rates within cities while legislation requiring state and federal cooperation results in a decrease in 911 reporting calls); Robert C. Davis & Nicole J. Henderson, *Willingness to Report Crimes: The Role of Ethnic Group Membership and Community Efficacy*, 49 Crime & Delinquency, 564 (2003) (following 1,123 interviews, correlates willingness to report crimes with feelings of community empowerment and community efficacy); *Fear and Silence: 2025 Insights from Advocates for Immigrant Survivors*, All. for Immigrant Survivors (June 18, 2025), https://www.immigrantsurvivors.org/2025-insights-from-advocates-for-immigrant-survivors (surveying 170 immigrant advocates and attorneys, ultimately reporting that 75.6% have concerns about contacting police); *US: Immigrants 'Afraid to Call 911'*, Hum. Rts. Watch (May 14, 2014 at 23:55 EDT), https://www.hrw.org/news/2014/05/14/us-immigrants-afraid-call-911 (illustrating how the entanglement of local law enforcement with immigration enforcement harms public safety overall); Law Enforcement

approach to immigration enforcement has ensnared tens of thousands of immigrants with no criminal charges or convictions at all. *See, e.g.*, Camilo Montoya-Galvez, *ICE's detainee population reaches 66,000, a new record high, statistics show*, CBS News (Nov. 6, 2025), https://www.cbsnews.com/news/ices-detainee-population-reaches-66000-a-new-record-high-statistics-show/ ("Department of Homeland Security figures show just over half—or around 33,000—of the individuals in ICE detention as of Thursday morning did not have criminal charges or convictions and were being held solely because of civil immigration violations."); David J. Bier, *65 Percent of People Taken by ICE Had No Convictions, 93 Percent No Violent Convictions*, Cato Inst. (June 20, 2025), https://www.cato.org/blog/65-people-taken-ice-had-no-convictions-93-no-violent-convictions.

Clearly delineating the distinct roles of police and immigration officials helps address this fear, especially when paired with meaningful outreach to immigrant communities to educate new immigrants about the protective function police play in the United States. That delineation relies in turn on the adoption, clear communication, and consistent enforcement of rules on the circumstances in which local police will—and will not—assist federal officials with federal immigration enforcement.[3] Though this judgment rests on amici's own experience, it is neither

---

Immigration Task Force & Police Executive Research Forum, *Building Trust with Immigrant Communities*, Police Executive Research Forum (2020) (stating that even immigrants with legal status are worried about reporting crimes because they fear the police may mistake their legal status); Nik Theodore & Robert Habans, *Policing Immigrant Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, 42 J. Ethnic & Migration Studies 970, 977 (2016) (finding that 70% of undocumented immigrants surveyed reported they are less likely to contact law enforcement authorities if they are victims of crime).

[3] *See* Kelly A. Yotebieng et al., *It Takes More than Translating a Flier: Considerations in Serving Immigrants as Victims of Crime in a Large Midwestern City*, 8 Border Crossing 12, 24-26 (2018) (noting that, despite the crime reducing effect of immigrants in the United States, these individuals are often victims with inadequate infrastructure to cooperate with federal immigration authorities and could be better supported with well-tailored victim

anecdotal nor theoretical. To the contrary, empirical research indicates that cities which limit cooperation with immigration enforcement more effectively maintain legitimacy in immigrant-heavy neighborhoods. For example, one study finds that when undocumented immigrants are told that local law enforcement officials are working with ICE, they are 60.8% less likely to report crimes witnessed, 42.9% less likely to report crimes they are victim to, and 68.3% less likely to participate in public events where police may be present. Tom K. Wong, *The Impact of Interior Immigration Enforcement on the Day-to-Day Behaviors of Undocumented Immigrants*, U.S. Immigr. Pol'y Ctr. (April 3, 2019), at 17, https://usipc.ucsd.edu/publications/usipc-working-paper-1.pdf.

By contrast, amici have not seen any evidence that policies like the Act cause an increase in crime, or that there is a connection between immigration and crime in general. Nor would such evidence be consistent with their experience. *See, e.g.*, Marta Ascherio, *Do Sanctuary Policies Increase Crime? Contrary Evidence from a County-Level Investigation in the United States*, 106 Soc. Sci. Research 1, 8 (2022) (analyzing data from 3,105 U.S. counties and concluding that local police declining notification and detainer requests from federal immigration enforcement "lead to a post-hoc *decline* in crime rates") (emphasis added); Benjamin O'Brien et al., *The Politics of Refuge: Sanctuary Cities, Crime, and Undocumented Immigration*, 55 Urban Affairs Review 1, 3-40 (2019) (finding that policies like the Act have no statistical impact on crime rate); Mary Spiro, *Sociological Research Reveals How Immigrants Can Reduce Crime*, Am. Socio. Ass'n (Oct. 31,

---

service provider services); Nicola Delvino & Markus González Beilfuss, *Latino Migrant Victims of Crime: Safe Reporting for Victims with Irregular Status in the United States and Spain*, 65 Am. Behavioral Scientist 1193, 1202-03 (2021) (describing the interplay between immigration, criminal legislation, and enforcement structures and finding that those with irregular status are scared to report crime for fear of repercussion but that improvements could be made through clearer communications and better guidelines).

2025), https://www.asanet.org/sociological-research-reveals-how-immigrants-can-reduce-crime (citing multiple studies to conclude that "[r]esearch demonstrates that cities with higher immigrant populations tend to have lower crime rates.").

**B.    Local Entities Are Best Positioned to Determine How to Use Local Resources.**

The Act also helps free local law-enforcement to concentrate on direct threats to public safety—such as violent crime, serious drug trafficking, and domestic violence—rather than enmeshing them in federal immigration enforcement tasks for which they are neither trained nor resourced.

Local police, prosecutors, and corrections agencies operate under tight personnel and budget constraints. This concern is even more pressing today, as the federal government cuts grants and cooperative agreements.[4] When local law enforcement becomes involved in gathering information for federal law enforcement, it risks diverting time, personnel, and attention away from core public safety functions. And cooperating with federal immigration enforcement, such as holding people for longer periods of time pursuant to ICE detainers, imposes real costs on local jurisdictions. For instance, one county estimated that holding detainees at the request of ICE costs nearly $15 million annually, with only limited federal reimbursement.[5] These are funds that county leaders could instead spend on constituents' priorities. This resource-allocation dynamic could help explain why jurisdictions with policies like the Act see fewer crimes than those without.[6]

---

[4]    *See generally, Effects of Federal Funding Cuts on Public Safety*, Brennan Ctr. for Just., https://www.brennancenter.org/series/effects-federal-funding-cuts-public-safety (last visited Nov. 22, 2025) (cataloguing and reporting on programs that result in federal funding cuts and the ramifications these cuts have on public safety).

[5]    Seth Hoy, *Illinois County "Just Says No" to Costly Immigration Detainers*, Am. Immigr. Council (Sept. 14, 2011), https://www.americanimmigrationcouncil.org/blog/illinois-county-"just-says-no"-to-costly-immigration-detainers/.

[6]    *See* Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy* (2017), https://www.americanprogress.org/article/the-effects-of-sanctuary-policies-on-crime-and-

Importantly, the Act does not require zero cooperation with federal authorities. Rather, it sets boundaries that allow for collaboration that is consistent with federal law and supports, rather than impedes, local priorities.[7] Indeed, Boston and jurisdictions like it continue to participate in joint task forces and information sharing around serious or violent crime. In 2024, for example, the Boston Police Department alongside Homeland Security Investigations and other local and federal law enforcement agencies conducted a major operation leading to charges against over forty members of a violent street gang for racketeering conspiracy, drug trafficking, and firearm offenses. *Heath Street Gang Members and Associates Charged in Federal Sweep*, U.S. Att'y's Off., Dist. of Mass. (Feb. 14, 2024), https://www.justice.gov/usao-ma/pr/heath-street-gang-members-and-associates-charged-federal-sweep.

In Illinois, the state police form part of the Chicago Violent Crimes Task Force where they work with federal agencies to combat gang violence, narcotics trafficking, and gun-related offenses. *See* JB Pritzker, *Written Testimony to the U.S. House Committee on Oversight and Accountability*, U.S. House of Representatives, 4 (June 12, 2025), https://oversight.house.gov/wp-content/uploads/2025/06/Pritzker-Written-Testimony.pdf. The head of the FBI's Chicago Field Office described one recent joint operation between the FBI and its "'partners,'" the Illinois State Police, where both forces collaborated to "identify the 25 baddest of the bad, worst violent

---

the-economy/ (following statistical analysis, finding that counties with policies similar to the Act have lower rates of crime and stronger economies than comparable counties without such laws); *see also* Mem. Supp. Def's Mot. Dismiss, ECF No. 16, at 1 (noting that Boston is "the safest major city in the country").

[7]    *See* Nancy Morawetz & Alina Das, *Legal Issues in Local Police Enforcement of Federal Immigration Law*, *in* The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties 69, 69-70 (2009) (noting the high risks involved with including local police in immigration enforcement, such as that enforcement actions will violate the rights of people in the community, and describing the benefits of local police developing collaborative boundaries with immigration enforcement).

criminals who had outstanding warrants." Bridgette Adu-Wadier, *How the FBI Works With Local Law Enforcement to Respond to Violent Crime*, WTTW (Sept. 2, 2025, at 19:28 CST), https://news.wttw.com/2025/09/02/how-fbi-works-local-law-enforcement-respond-violent-crime. Police in Albuquerque, New Mexico, participate in federal task forces that have arrested violent criminals. *See, e.g.*, *Multi-Agency Task Force Leads to Arrest*, City of Albuquerque (May 2, 2022), https://www.cabq.gov/police/news/multi-agency-task-force-leads-to-arrest (highlighting collaboration between Albuquerque Police Department and many other law enforcement partners to conduct arrests). And cities across the country, even those with laws and policies similar to the Act, cooperate with federal law enforcement to address violent crimes. *See, e.g.*, *Thirty Charged in Sweeping Federal Case Targeting Tren de Aragua Members and Associates for Drug Trafficking, Murder-for-Hire, and Firearms Crimes*, U.S. Attn'y's Off., Dist. of Colo. (Aug. 18, 2025), https://www.justice.gov/usao-co/pr/thirty-charged-sweeping-federal-case-targeting-tren-de-aragua-members-and-associates (noting the assistance of the Denver Police Department, among other local agencies).

In other words, local and federal law enforcement are working together every day to keep us all safe. The Act, and other laws and policies like it, do not impede this critical work.

## II.    The Boston Trust Act Allows Local Law Enforcement to Pursue Local Interests, and Federal Law Enforcement to Pursue Federal Interests.

The Boston City Council has repeatedly emphasized that the Act seeks to ensure a safe and welcoming City for all by promoting trust in local law enforcement and distinguishing the duties of Boston Police from those of federal law enforcement. *See, e.g.*, Compl. Ex. 1 (Boston Trust Act 2014) at 2, ECF No. 1-1 ("WHEREAS, When local law enforcement officials indiscriminately honor all ICE civil immigration detainer requests, including those that target non-criminal aliens, immigrant residents are less likely to cooperate and public trust erodes, hindering the ability and

11

effectiveness of Boston's police force"); Compl. Ex. 2 (Boston Trust Act 2019) at 2, ECF No. 1-2

("WHEREAS, The City of Boston seeks to ensure that all immigrants are able to fully participate

in the civic and economic life of their neighborhoods and nurture and grow the spirit of unity in

our City").[8] In reaffirming the Act in 2024, the City Council also expressed concern about negative

rhetoric regarding immigrant populations, which the Council feared jeopardized police-

community relations.[9]

These are policy judgments that go to Boston's core local interests, which Boston was

entitled to make. *See, e.g.*, *United States v. New Jersey*, 2021 WL 252270, at *7 (D.N.J. Jan. 26,

2021) ("New Jersey's decision not to cooperate with the enforcement of federal immigration law

is a clear exercise of its police power to regulate the conduct of its own law enforcement

agencies"); *City of Chi.*, 888 F.3d at 291 ("[L]ocal and state governments have concluded that the

safety of their communities is furthered by a relationship of trust with the undocumented persons

and lawful immigrants residing therein—and those localities are clearly in the best position to

determine the security needs of their own communities."). The Act preserves the proper

constitutional balance, focusing local resources on local priorities, and leaving federal priorities to

---

[8]     *See also Council Reaffirms the Trust Act*, City of Boston, (Dec. 6, 2024),
        https://www.boston.gov/news/council-reaffirms-trust-act ("The Boston Trust Act . . .
        defines the distinct roles and responsibilities of the Boston Police Department (BPD) and
        the U.S. Immigration and Customs Enforcement (ICE), promoting trust between local law
        enforcement and immigrant communities.").

[9]     Boston City Council, *Resolution 2024-1788,* Boston Granicus, at 1:06:12, 1:08:36,
        https://boston.granicus.com/player/clip/10154?view_id=1&meta_id=72395&redirect=tru
        e (Council President Ruthzee Luijeune stating that "[a]s the national climate grows
        increasingly hostile to immigrant populations, we must reaffirm who we are as a city."
        Council Member Julia Mejia adding that "[w]e recognize the importance of collaboration
        with federal agencies like ICE, HSI Office for Intelligence on issues such as combating
        human trafficking and cybercrimes while drawing a clear line against local involvement in
        civil immigration enforcement. This balance is essential for promoting public safety
        without compromising the trust of our immigrant residents.").

be acted upon by federal dollars. *See, e.g.*, *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 474 (2018) ("If Congress enacts a law and requires enforcement by the Executive Branch, it must appropriate the funds needed to administer the program."); *Printz v. United States*, 521 U.S. 898, 922 (1997) ("The power of the Federal Government would be augmented immeasurably if it were able to impress into its service—and at no cost to itself—the police officers of the 50 States.").

In other words, the Act simply leaves the enforcement of federal law to the federal government. This means that—contrary to the allegations in the Complaint, *see, e.g.*, Compl. ¶¶ 4, 6, 8, 9, 50—the Act does not impede federal immigration enforcement. Rather, the Act directs City officials not to use City resources to carry out work that federal law-enforcement agencies are responsible for. And even with these restrictions, the Act still permits local officials to coordinate with federal immigration authorities where the enforcement of local law is furthered. For example, it allows City officials to participate in investigations of alleged criminal reentry into the United States when they learn of the alleged violation during unrelated policing activity. *See* Compl. Ex. 2 (Boston Trust Act 2019) at § 4(b), ECF No. 1-2 (referencing investigations of violations of 8 U.S.C. § 1326). City officials may also fulfill Department of Homeland Security Investigations requests for information about a person's criminal history, participate in task forces with federal agents that do not have a "primary purpose" of enforcing civil violations of federal immigration law, certify the status of certain victims of crime or trafficking, and enforce federal laws against the sale of firearms to unlawfully present noncitizens. *Id.*

In amici's experience, that balance is an appropriate one. The goals of local law enforcement can be compromised if officers spend time on immigration holds rather than crime investigations. Local officers also often lack the training to carry out immigration tasks, increasing

liability or misallocation of resources. By clearly delineating local and federal roles, the Act helps ensure different arms of law enforcement are able to pursue their mandates with the limited resources available to them.

### CONCLUSION

The Boston Trust Act effectively promotes Boston's interests in preserving public safety and maintaining an appropriate division of responsibility between local and federal law enforcement. For these reasons, and consistent with amici's decades of experience in law enforcement, amici support Defendants' Motion to Dismiss.

November 24, 2025                 Respectfully submitted,

                                 By:      /s/ Austin Anderson
                                 _____

                                       Austin P. Anderson (BBO #696414)
                                       ANDERSON & KREIGER LLP
                                       50 Milk Street, 21st Floor
                                       Boston, Massachusetts 02109
                                       (617) 621-6500
                                       aanderson@andersonkreiger.com

                                       Ames Grawert (*pro hac vice* pending)
                                       Brianna Seid (*pro hac vice* pending)
                                       BRENNAN CENTER FOR JUSTICE
                                       120 Broadway, Suite 1750
                                       New York, NY 10271
                                       (646) 292-8310
                                       grawerta@brennan.law.nyu.edu
                                       seidb@brennan.law.nyu.edu

                                       *Attorneys for Amici Curiae*
                                       *Law Enforcement Officials*

## **APPENDIX A**

List of *Amici Curiae*

- Chief Chris Burbank (Retired) – Salt Lake City Police Department
- Zachary W. Carter – United States Attorney, Eastern District of New York, 1993–99
- Cyrus Vance, Jr. – District Attorney, New York County (Manhattan), 2010–22
- Beth McCann – District Attorney, Denver, Colorado, 2017–25
- Bernard Warner – Secretary, Washington State Department of Corrections, 2011–15
- Vincent Schiraldi – Secretary, Maryland Department of Juvenile Corrections, 2023–25; Commissioner, NYC Department of Corrections, 2021