# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

THE UNITED STATES OF AMERICA,

     *Plaintiff*,

    v.

THE CITY OF BOSTON; MICHELLE WU, Mayor of the City of Boston, in her Official Capacity; BOSTON POLICE DEPARTMENT; MICHAEL A. COX, Police Commissioner, in his Official Capacity,

     *Defendants*.

Case No. 1:25-cv-12456-LTS

# MEMORANDUM OF LAW IN OPPOSITION
# TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

    I.     Constitutional Principles ........................................................................... 2

    II.    Statutory Background ................................................................................. 3

    III.   Boston Trust Act ........................................................................................ 5

    IV.   Procedural History ..................................................................................... 6

LEGAL STANDARD ........................................................................................................... 7

ARGUMENT ........................................................................................................................ 8

    I.     THE COMPLAINT STATES A CLAIM OF PREEMPTION. ............................. 8

          A.    The Complaint Sufficiently States a Claim of Conflict and Express
              Preemption. ...................................................................................... 8

          B.    Defendants' Conduct is Not Sanctioned by the Tenth Amendment. ........ 12

    II.    THE COMPLAINT STATES A CLAIM OF VIOLATION OF
          INTERGOVERNMENTAL IMMUNITY PRINCIPLES. ................................... 15

          A.    The Complaint Sufficiently Alleges Interference with Federal
              Immigration Enforcement. ................................................................ 16

          B.    The Complaint States a Claim of Unlawful Discrimination Against
              the Federal Government. .................................................................... 20

CONCLUSION ..................................................................................................................... 25

CERTIFICATE OF SERVICE

**INTRODUCTION**

Under both the Constitution and the Immigration and Nationality Act ("INA"), the Executive Branch has "broad, undoubted power" to arrest and detain illegal aliens to effectuate their removal. *See Arizona v. United States*, 567 U.S. 387, 394 (2012). As the Supreme Court has explained, "deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers." *Nielsen v. Preap*, 586 U.S. 392, 398 (2019). That is why the INA not only authorizes but *requires* federal agents to detain illegal aliens who, based on their commission of certain crimes, pose a threat to public safety. *See* 8 U.S.C. § 1226(c)(1). That threat to public safety is also why, upon his inauguration, President Trump declared a national emergency at the southern border resulting from the unprecedented influx of illegal aliens. *See* Protecting the American People Against Invasion, Executive Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025).

As evident on its face, and as demonstrated in the United States' Complaint, the Boston Trust Act unconstitutionally impedes federal officers from enforcing immigration laws, regulates where and how those officers may make civil arrests, and discriminatorily restricts disclosure of information only to federal immigration authorities. The City of Boston, however, has now moved to dismiss the Complaint, arguing the Trust Act neither preempts federal law nor violates the intergovernmental immunity doctrine. However, Boston's conduct creates a substantial obstacle to ICE's enforcement operations and interferes with the federal government's legal prerogative in immigration enforcement. Indeed, the City's Trust Act has and continues to impede federal immigration enforcement. Further obstruction of the enforcement of the nation's immigration laws must be prevented.

1

For these reasons, and those set out in more detail below, this Court should deny the City of Boston's motion.

## BACKGROUND

### I.    Constitutional Principles

The Constitution establishes a system of "dual sovereignty," in which the Federal Government and the States both wield sovereign powers. *See Murphy v. NCAA*, 584 U.S. 453, 458 (2018). Under that system, while the Federal Government lacks the "power to issue orders directly to the States," *id.* at 470, there are "certain limits on the sovereign powers of the States, limits that are an essential part of the Framers' conception of national identity and Union," *California v. Superior Ct. of California*, 482 U.S. 400, 405 (1987).

For example, the Constitution expressly prohibits States from engaging in certain foreign-facing conduct like entering into treaties and laying duties on imports and exports. *See* U.S. Const. art. I § 10. It also implicitly restricts States from exercising their powers in a way that would undermine grants of power to the Federal Government or harm other States. *See, e.g.*, *Dep't of Revenue of Kentucky v. Davis*, 553 U.S. 328, 337 (2008) (explaining that the Court has read into the Commerce Clause a limitation on States to effectuate the Framers' intent to prevent a State from retreating into economic isolation); *Puerto Rico v. Branstad*, 483 U.S. 219, 226 (1987) ("[T]he Extradition Clause creates a mandatory duty to deliver up fugitives upon proper demand[.]"); *Kentucky v. Dennison*, 65 U.S. 66, 100 (1860) ("[I]t is manifest that the statesmen who framed the Constitution were fully sensible, that from the complex character of the Government, it must fail unless the States mutually supported each other and the General Government[.]"). The Constitution also grants enumerated legislative powers to Congress, *see* art. I, § 8, and confirms that legislative powers not granted to Congress are reserved for the States, *see* U.S. Const. amend. X.

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona*, 567 U.S. at 399. Just as the Federal Government cannot commandeer a State, so too a State cannot enact laws that conflict with federal policy or regulate or discriminate against the Federal Government. *See Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *South Carolina v. Baker*, 485 U.S. 505, 523 (1988); *Mayo v. United States*, 319 U.S. 441, 445 (1943). When a state does so, the Supremacy Clause provides a clear rule: federal law "shall be the supreme Law of the Land," and the state law must give way. *See* U.S. Const. art. VI, cl. 2; *Arizona*, 567 U.S. at 399.

## II.    Statutory Background

Following President Trump's declaration of a national emergency resulting from illegal immigration, *see* Executive Order No. 14,159, 90 Fed. Reg. 8443, Congress enacted the Laken Riley Act, named for the nursing student killed by an alien who, after entering the United States illegally, committed additional crimes but was released before immigration authorities could intervene. *See* Pub. L. No. 119-1, 139 Stat. 3 (2025) (codified at 8 U.S.C. § 1226 *et seq.*).  The Act expands the list of predicate crimes that trigger mandatory detention. *See* 8 U.S.C. § 1226(c)(1)(E)(ii).  If the Federal Government fails to detain an alien as required under the Act, and the alien harms a state or its residents, the Act authorizes the relevant state to sue the Federal Government "to obtain appropriate injunctive relief." *See id.* § 1226(f).

Responsibility for enforcing the immigration laws rests primarily with the U.S. Department of Homeland Security ("DHS") and two of its components: Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP").  Congress provided these agencies several tools to carry out their duties under the INA.  As relevant here, the INA authorizes federal agents to make civil immigration arrests, with or without an administrative warrant. *See*

3

*id.* § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."); *id.* § 1357(a)(2) (immigration officers "shall have power without warrant" to "arrest any alien who . . . is entering or attempting to enter the United States in violation of any [immigration] law or regulation . . . , or to arrest any alien in the United States, if . . . the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained"). When an administrative warrant is required, immigration officials "must establish probable cause to believe that the subject is an alien who is removable from the United States." U.S. Immigr. & Customs Enf't, Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers*, § 2.4 (Mar. 24, 2017).

In executing the immigration laws, federal agents rely on law enforcement partners in states and localities across the country. *See Arizona*, 567 U.S. at 411 ("Consultation between federal and state officials is an important feature of the immigration system."). Several provisions of the INA reflect that contemplated collaboration. *See, e.g.*, 8 U.S.C. § 1357(g)(10)(A) (providing that no formal agreement is required "for any officer or employee of a State or political subdivision of a State[] to communicate with [federal immigration officials] regarding the immigration status of any individual"); *id.* § 1357(g)(10)(B) (providing that state and local officials may "cooperate with the [Federal Government] in the identification, apprehension, detention, or removal of" unlawful aliens). In particular, 8 U.S.C. § 1373(a) provides that "State" and "local government entit[ies] or official[s] may not prohibit, or in any way restrict, any government entity or official from sending to" federal immigration agencies "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *See id.* § 1373(a). Similar provisions exist throughout the INA. *See id.* § 1373(b) ("[N]o person or agency may prohibit, or in any way restrict, a Federal,

4

State, or local government entity from" "[s]ending" to or "requesting or receiving" from federal immigration authorities "information regarding the immigration status, lawful or unlawful, of any individual."); *id.* § 1644 (similar).

In turn, Section 1373(c) provides that federal immigration authorities "shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." *See id.* § 1373(c). The Federal Government is also responsible for making resources available to states and localities regarding whether individuals who have been arrested for aggravated felonies are aliens. *See id.* § 1226(d)(1)(A). And the Federal Government designates liaisons with states and localities in connection with aliens charged with aggravated felonies. *See id.* §§ 1226(c)-(d)(1)(B), 1231(a).

### III.    The Boston Trust Act

In 2014, the Boston City Council passed the "Boston Trust Act." Its preamble declared that "[w]hen local law enforcement officials indiscriminately honor all ICE civil immigration detainer requests, including those that target non-criminal aliens, immigrant residents are less likely to cooperate and public trust erodes, hindering the ability and effectiveness of Boston's police force." AN ORDINANCE ESTABLISHING A BOSTON TRUST ACT (2014), Preamble ¶ 6. Accordingly, the Boston Trust Act directs the Boston Police Department to categorically flout federal immigration detainer requests so that removable aliens can evade ICE apprehension.

The Boston Trust Act was amended in 2019, strengthening its obstructionist policy by "making clear the role of Boston Police officers, outlining how they will not: ask individuals about their immigration status, share information with ICE, make arrests based solely on ICE

administrative warrants, perform the functions of federal immigration officers, and transfer an individual to ICE custody." *Signing of Trust Act Amendments into Law*, BOSTON GOV'T (Dec. 19, 2019), https://www.boston.gov/news/signing-trust-act-amendments-law; *see generally* Bos., Mass., Mun. Code ch. 11, § 1.9 (2019). The Boston City Councilor who authored the Boston Trust Act touted that the 2019 amendment ensures "that our city's law enforcement personnel and resources are able to focus on public safety, not enforcing failed federal immigration policy." *Signing of Trust Act Amendments into Law*, *supra*.

The amended Boston Trust Act expressly directs that "a law enforcement official shall not detain an individual solely on the basis of a civil immigration detainer request or an ICE administrative warrant after the individual is eligible for release from custody, unless ICE has a criminal warrant, issued by a Judicial Officer, for the individual." Bos., Mass., Mun. Code ch. 11, § 1.9(B). The Boston Trust Act further directs law enforcement officials not to use "Agency or Department monies or personnel to interrogate, detain or arrest persons for immigration enforcement purposes . . . ," including, *inter alia*, providing aliens' release dates and times to federal immigration authorities and inquiring into an individual's immigration status. *Id.* § 1.9(D)(1)(a). In addition, the Boston Trust Act directs law enforcement to prohibit "transfer[ing] an individual to immigration authorities unless authorized by a judicial warrant or other judicial order." *Id.* § 1.9(D)(1)(b).

The Boston Trust Act contains certain exceptions that allow law enforcement officials to cooperate with ICE, Bos., Mass., Mun. Code ch. 11, § 1.9(D)(2)-(3), but limited to the criminal law enforcement context. *E.g. id.* § 1.9(D)(2)(c) (providing that "this section does not prevent any Boston law enforcement official" from "[c]onducting enforcement or investigative duties associated with partnerships with federal authorities or task forces . . . so long as the primary

purpose of the partnership or task force is not to enforce civil violations of United States immigration laws"). In December 2024, the Boston City Council adopted a resolution to reaffirm the Boston Trust Act, demonstrating that it has no future plans to cooperate with federal immigration enforcement. *Council Reaffirms the Trust Act*, BOSTON GOV'T (Dec. 6, 2024), https://www.boston.gov/news/council-reaffirms-trust-act.

### IV.    Procedural History

The United States filed this action on September 4, 2025 against Defendants City of Boston, the Boston Police Department, and, in their official capacities, Mayor Michelle Wu, and Police Commissioner Michael Cox. The Complaint raises three claims under the Supremacy Clause: preemption (Count One); unlawful regulation of the Federal Government (Count Two); and unlawful discrimination against the Federal Government (Count Three). *See* Compl. ¶¶ 52-64, ECF No. 1. The United States seeks declaratory and injunctive relief preventing Defendants from further enforcing the challenged provisions of the Boston Trust Act against the Federal Government. On November 17, 2025, Defendants moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). *See* Motion to Dismiss, ECF No. 15 ("Motion"). Defendants do not dispute that the Court has jurisdiction over this case. The United States now opposes that motion.

### LEGAL STANDARD

To withstand a motion to dismiss under Rule 12(b)(6), a complaint need only contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept as true all the Complaint's plausible factual allegations and construe all reasonable inferences in favor of the plaintiff. *Id.*; *see Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 15 (1st Cir. 2011).

## ARGUMENT

## I.    THE COMPLAINT STATES A CLAIM OF PREEMPTION.

The Court should deny Defendants' motion to dismiss the conflict and express preemption claims in Count One because the Complaint sufficiently alleges interference with federal immigration enforcement under 8 U.S.C. §§ 1373(a) and 1644, and Defendants cannot justify this interference under the Tenth Amendment. "[T]he very essence of supremacy" empowers the Federal Government to "remove all obstacles to its action within its own sphere." *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427 (1819). Accordingly, a state law is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *E.g.*, *Hines*, 312 U.S. at 67. A state may not take action that "either frustrates the purpose of the national legislation or impairs the efficiency of th[e] agencies of the federal government to discharge the duties for the performance of which they were created." *Davis v. Elmire Sav. Bank*, 161 U.S. 275, 283 (1896); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). Congress may also indicate preemptive intent through "a statute's express language or through its structure and purpose." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). "[T]he scope of a statute's pre-emptive effect is guided by the rule that '[t]he purpose of Congress is the ultimate touchstone' in every pre-emption case." *Id.* (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996)).

### A.    The Complaint Sufficiently States a Claim of Conflict and Express Preemption.

As alleged in the Complaint, Compl. ¶¶ 52-56, the Trust Act stands as an obstacle to federal immigration officers' ability to detain and remove criminal illegal aliens as required by the INA in two principal ways.

*First*, the Trust Act prevents state and local officers from turning aliens over to federal custody when presented with congressionally authorized detainers and administrative warrants—even upon the alien's release from state or local custody when the State's regulatory interest in the alien has extinguished. Bos., Mass., Mun. Code ch. 11, § 1.9 (2019). Congress expressly granted these tools to ICE so that it may efficiently accomplish its unique statutory mission.

*Detainers*. When an alien is in another law enforcement agency's custody, immigration officers can issue a detainer. An immigration detainer is "a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible." 8 C.F.R. § 287.7(a). As relevant here, ICE uses immigration detainers to ensure that immigration officials can safely and effectively detain aliens who are in City detention upon the alien's release from City custody. A detainer might also ask the City to retain custody over the alien for a brief period, thereby ensuring a safe transfer into federal custody. 8 C.F.R. § 287.7(d).

*Administrative Warrants*. An administrative warrant provides for the arrest and detention of an alien. Unlike a judicial warrant, an administrative warrant is not issued on probable cause of a criminal law violation, and unlike a judicial warrant, an administrative warrant is issued by an Executive Branch official not an Article III judge. Immigration officers may issue an administrative warrant upon a showing of probable cause for removal.

This statutory and regulatory framework makes clear that Congress intended the detention and removal process to be an expedited procedure. *See, e.g.*, 8 U.S.C. § 1226(a) (expressly authorizing the use of administrative warrants); *id.* § 1226(c) (requiring federal agents to assume custody of an alien immediately upon the alien's release from state or local custody); *id.* § 1231 ("Once an alien is ordered removed, the Attorney General must remove the alien from the United

States within 90 days, and the alien must be detained during the removal period."). But by refusing to turn aliens over to federal custody pursuant to detainers and administrative warrants, the City of Boston requires federal agents to independently track down and rearrest aliens at large when (and if) those agents learn that the alien has been released from City custody—and they must do so before the alien reoffends or absconds to another jurisdiction. *See* Compl. ¶ 70. The prohibition on honoring detainers and administrative warrants therefore endangers federal agents and the public. It also obstructs and impairs the efficiency of the federal process in a way that is inconsistent with congressional design. *See Davis*, 161 U.S. at 283 (explaining that state laws cannot "impair[] the efficiency of th[o]se agencies of the federal government" in the "discharge [of] the[ir] duties"); *Nash v. Fla. Indus. Comm'n*, 389 U.S. 235, 240 (1967); *see also Murphy*, 584 U.S. at 477 (noting preemption of state law is proper where "it impose[s] a duty that [i]s inconsistent – i.e., in conflict – with federal law").

*Second*, the Trust Act prohibits Boston police officers from sharing virtually all useful and relevant information for the apprehension of unlawfully present aliens. Bos., Mass., Mun. Code ch. 11, § 1.9(D)(1)(a). This restriction aggravates the Trust Act's already heightened requirements for obtaining the City's compliance with federal immigration law. The Trust Act requires judicial warrants, but it obstructs ICE's ability to procure such warrants by cutting ICE off from critical information—including that derived from access to detainees for investigatory purposes—needed to satisfy the heightened standard of such warrants. Thus, the Trust Act simultaneously requires a judicial warrant while refusing ICE the very information needed to secure such a warrant. At the same time, the Trust Act does not impose similar restrictions on any other law enforcement entities, whether local, state, or federal, which further underscores that the Trust Act is designed to and in fact interferes with federal immigration law enforcement.

Even if federal agents could stake out City jail facilities to try to independently stage arrests when aliens emerge from custody, the Trust Act instructs City officials to refuse ICE agents' requests for information that is critical for that purpose. Bos., Mass., Mun. Code ch. 11, § 1.9(D)(1)(a). The alien's release from City custody is a pre-condition to the initiation of federal custody, and City officers effectuate that release. Forcing federal agents to try to stage an arrest without even the most basic information about their target such as his release date, *see* Compl. ¶ 47, is nearly impossible.

Congress intentionally protected ICE's information gathering tools to prevent the impracticability the Trust Act creates:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

8 U.S.C. §§ 1373, 1644. The Trust Act frustrates congressional design because it circumvents these statutes and denies ICE access to the information needed to complete its congressionally mandated mission: the removal of unlawfully present aliens.

The Government also disagrees with Defendants, ECF No. 16 at 11, and other courts that narrowly interpreted "information regarding the citizenship or immigration status" to only cover an alien's status.[1] Information "*regarding* citizenship or immigration status" necessarily must

---

[1] This narrow interpretation of Sections 1373 and 1644 is the basis for the Trust Act's illusory savings clause that authorizes City officials to provide ICE with aliens' statuses only. Bos., Mass., Mun. Code ch. 11, § 1.9(D)(3). However, federal law is not so narrow, and thus the Trust Act obstructs it.

include information in addition to an alien's citizenship or immigration status, namely those predicate facts necessary to determine one's citizenship or immigration status. *See Patel v. Garland*, 596 U.S. 328, 338-39 (2022) ("Similarly, the use of 'regarding' 'in a legal context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject.'"). Release-date information for example, which delineates when an alien might be removed, would serve as information *regarding* one's immigration status. *See* 8 U.S.C. §§ 1231(a)(1)(B)(iii), (a)(4)(A). Accordingly, the Trust Act's indiscriminate prohibition on information sharing for all noncriminal immigration enforcement is preempted because it encompasses all information beyond an alien's status—including all information *regarding* it. *See Patel*, 596 U.S. at 339 (construing statute's use of "regarding" broadly, thereby determining that "§ 1252(a)(2)(B)(i) encompasses not just 'the granting of relief' but also any judgment *relating* to the granting of relief. That plainly includes factual findings.").

**B.    Defendants' Conduct is Not Sanctioned by the Tenth Amendment.**

Defendants erroneously characterize their obstruction of federal immigration enforcement, *see* ECF No. 16 at 9-10, 13-14, as their prerogative under the Tenth Amendment. The Tenth Amendment anticommandeering doctrine prevents Congress from "compel[ling] the States to enact or enforce a federal regulatory program," or "circumvent[ing] that prohibition by conscripting the State's officers directly." *Printz v. United States*, 521 U.S. 898, 935 (1997); *see also Murphy*, 584 U.S. at 473. By preventing the Federal Government from commandeering the States, the Tenth Amendment serves as "one of the Constitution's structural protections of liberty," "promotes political accountability," and "prevents Congress from shifting the costs of regulation to the States." *Murphy*, 584 U.S. at 473 (citation omitted). But the Tenth Amendment is not implicated where the Federal Government seeks to regulate private actors. Indeed, *Murphy*

12

expressly declined to disturb the bedrock principle under the Supremacy Clause that state and local laws that obstruct federal laws "regulat[ing] private actors" are "preempt[ed]." *Murphy*, 584 U.S. at 476–77. Because the Federal Government here seeks to regulate private individuals—aliens— and prevent Defendants from interfering with its ability to do so, prohibiting that interference does not run afoul of the Tenth Amendment.

Despite Defendants' attempts to cast federal law as an "invitation of voluntary cooperation," *see* ECF No. 16 at 8, Defendants' actions are not passive. To the contrary, as alleged here, Defendants are actively facilitating aliens' evasion of federal law first by asserting criminal custody over aliens whom the Federal Government seeks to detain and remove, and then by terminating custody in a manner that hinders federal detention and removal. *See, e.g.*, Compl. ¶ 8 (alleging that Defendants affirmatively thwart federal law enforcement efforts). Unlike in *Murphy*, where the federal statutory provision at issue did not "impose any federal restrictions on private actors," but instead sought to prohibit states from authorizing sports gambling schemes, *id.* at 480, here, the Federal Government and the State both seek to regulate private individuals. The issue is therefore not whether the Federal Government has commandeered a State, but whether the State's scheme is preempted insofar as it poses an obstacle to the effectuation of the federal scheme. And it is precisely when two regulatory schemes collide in this fashion that the Supremacy Clause prohibits the State from using its authority to create an obstacle to the functioning of the federal scheme. *See Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289–90 (1981) (stating that it "is incorrect" to "assume that the Tenth Amendment limits congressional power to preempt or displace state regulation of private activities . . .").

Indeed, given the Federal Government's exclusive authority over immigration, Congress could have provided that it would immediately remove aliens regardless of pending state criminal

prosecutions. Instead, Congress allows States to enforce their criminal laws against aliens before deportation. But if States choose to do so, they cannot terminate custody in a way that frustrates the Federal Government in assuming custody for the purpose of removing the alien. Allowing state criminal custody to continue followed by an orderly transfer to federal officers at the end of such custody does not in any sense "commandeer" the state into enforcing federal law, but merely places conditions on the state's exercise of the state's own regulatory authority. *See id.* at 290–91 ("We fail to see why the Surface Mining Act should become constitutionally suspect simply because Congress chose to allow the States a regulatory role."). So long as Congress is expressly or implicitly preempting the State from interfering with federal regulation of private parties, it is not impermissibly regulating the State directly.

Unlike the "commandeering" cases where the Supreme Court was concerned about political accountability, the Federal Government here is not requiring Boston to enforce federal law; it does not expect Boston police to arrest particular aliens or extend the custody of those who would otherwise be released. *See Printz*, 521 U.S. at 926 (citing *New York v. United States*, 505 U.S. 144, 188 (1992)); *see also Murphy*, 584 U.S. at 473. Instead, it is the Federal Government that seeks to assume custody, and only of those aliens that Boston has already decided, for its own reasons, to take into custody pursuant to state and local criminal law. When ICE shows up at a City facility to take an alien into federal custody, there is no question of responsibility. The Federal Government bears sole responsibility for the actions it takes with respect to private persons pursuant to its regulatory authority. *Cf.* 8 U.S.C. § 1226(f) (allowing States to sue the Federal Government for decisions or failures with respect to the detention of aliens that cause harm to a State or its residents).

Ultimately, the Tenth Amendment must be understood in the context of the Constitution as a whole. Limits on the sovereign powers of the States "are an essential part of the Framers' conception of national identity and Union." *California*, 482 U.S. at 405. Writing on the Extradition Clause, the Supreme Court noted its "obvious objective" "that no State should become a safe haven for the fugitives from a sister State's criminal justice system." *Id.* at 406. That Clause provides that one State may demand that another State return fugitives to its custody. *See* U.S. Const. art. IV, § 2; *see also Kentucky*, 65 U.S. at 100 ("[I]t is manifest that the statesmen who framed the Constitution were fully sensible, that from the complex character of the Government, it must fail unless the States mutually supported each other and the General Government[.]"). If one State could demand that another State release a criminal into its custody without offending the Constitution, it follows that the United States can do the same.

For these reasons, Count I's preemption claim withstands dismissal.

## II.    THE COMPLAINT STATES A CLAIM OF VIOLATION OF INTERGOVERNMENTAL IMMUNITY PRINCIPLES.

The Complaint likewise states a claim that the Boston Trust Act is alternatively invalid under the intergovernmental immunity doctrine. *See* Compl. ¶¶ 57–60 (Count Two); *id.* ¶¶ 61–64 (Count Three). A state law violates intergovernmental immunity if it "regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *See North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion). That prohibition applies even without preemptive legislation because the Supremacy Clause itself invalidates such state regulations: "intergovernmental immunity has independent bite, and courts must apply it to referee 'clashing sovereignty.'" *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 328 (3d Cir. 2025) (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 430).

### A.    The Complaint Sufficiently Alleges Purported Direct Regulation of the Federal Government.

The Boston Trust Act unlawfully regulates the Federal Government by preventing federal agents from using their Congressionally authorized tools to effectuate alien detentions and removals. Stemming from the Supremacy Clause, the doctrine of intergovernmental immunity prevents States from regulating the activities of the Federal Government. *See Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal Government are free from regulation by any state."); *see also McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 436 (1819) (explaining that the States have no power to "in any manner control" the operations of the Federal Government); *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956) (explaining that "the immunity of the instruments of the United States . . . extends to a requirement that they desist from performance until they satisfy a state officer" (quoting *Johnson v. Maryland*, 254 U.S. 51, 57 (1920)). Thus, "even in the absence of a specific federal law, federal officers are immune from state interference with acts 'necessary and proper' to the accomplishment of their federal duties." *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993), *aff'd* 54 F.2d 825 (D.C. Cir. 1995) (citing *Cunningham v. Neagle*, 135 U.S. 1 (1890)).

Under those principles, the Boston Trust Act, as alleged in the Complaint, *see* Compl. ¶¶ 45, 47, 51 62, 64, improperly regulates the Federal Government by requiring ICE agents to procure criminal warrants to access detainees and obtain information when Congress has authorized federal immigration officials to use detainers and administrative warrants for those purposes. *See*, *e.g.*, Bos., Mass., Mun. Code ch. 11, §§ 1.9(B) ("A law enforcement official shall not detain an individual solely on the basis of a civil immigration detainer request or an ICE administrative warrant . . . unless ICE has a criminal warrant, issued by a Judicial Officer, for the individual"). Congress expressly provided that "[o]n a warrant issued by the Attorney General, an

16

alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). And the Supreme Court has acknowledged the role that administrative warrants play in the detention and removal process. *See Arizona*, 567 U.S. at 407–08 (noting that the Attorney General has discretion to issue warrants, which are executed by federal officers).

Defendants deny that the Boston Trust Act regulates the Federal Government, insisting that it "regulates only the conduct of City officials[,]" and that "[t]he Complaint seeks to twist that purely internal regulation into a restriction on the federal government's conduct." ECF No. 16 at 18. Defendants cite to *McHenry Cnty. v. Raoul*, 44 F.4th 581, 593 (7th Cir. 2022), for the proposition that local laws that regulate only local entities cannot possibly "amount to direct regulation." ECF No. 16 at 19. But this Court should "see the law for what it really is"—an attempt to "dictate the manner in which the federal [immigration] function is carried out." *CoreCivic, Inc.*, 145 F.4th at 329 (alteration in original) (quoting *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 n.3 (1988)). Indeed, since *McHenry County*, courts have recognized that laws can regulate the Federal Government even though, as here, they purport to operate against others. *See, e.g.*, *Geo Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) (holding that California statute which phased out all private detention facilities within the State, as applied to ICE detention facilities operated by contractors, violated intergovernmental immunity); *King County*, 122 F.4th at 757 (finding unlawful regulation where a County Order directed local officials to ensure that operators who leased space from the County's airport would not service ICE charter flights, thereby overriding the Federal Government's choice to use contractors to run its flights). Illustratively, in *CoreCivic*, the Third Circuit rejected the argument Defendants proffer. In that case, a New Jersey state law prohibited a private contractor from renewing its contract to provide detention for ICE detainees.

New Jersey argued, as do Defendants here, that its law applied "only to the state, its municipalities, and private contractors . . ." but "not to the federal government." *Id*. at 322. Thus, that state law, according to New Jersey, did not directly bar "the federal government from doing anything." The Third Circuit rejected that argument. Although "[t]rue," the state law's text did "not apply to the federal government," *id*. at 325, "[i]t is a direct regulation in everything but name." *Id*. at 326. As the court reasoned, "[f]ederal law gives federal officials discretion to contract for immigration detention," *id*. at 327, and "New Jersey's law destroys that discretion." *Id*. "Intergovernmental immunity is not a formalist doctrine." *Id*. at 322. Instead, courts "must probe the 'purpose or self-evident operation of a statute' to see if it is used to evade the limits on immunity 'by directly achieving the same result.'" *Id*. Put differently, "the modern doctrine distinguishes between laws that merely impose an incidental . . . burden on the federal government and those that subvert federal operations. The latter trigger immunity; the former do not." *Id*. at 323.

The Boston Trust Act "is on the wrong side of that line." *Id*. at 319. Whereas administrative warrants issue on probable cause that the individual is an alien who is subject to removal, criminal judicial warrants—that the City of Boston mandates—issue on probable cause that a crime has been committed, *see Berger*, 388 U.S. 41, 55 (1967). In other words, Congress allows federal agents to detain illegal aliens under the former standard, but the Boston Trust Act does not. *See* 8 U.S.C. § 1226(a); *see also Abel v. United States*, 362 U.S. 217, 233 (1960) (acknowledging the "overwhelming historical legislative recognition of the propriety of administrative arrest for deportable aliens" (citing, among others, Act of June 25, 1798, ch. 58, § 1, 1 Stat. 570, 570-71 ("[I]t shall be lawful for the President of the United States . . . to order all such aliens as he shall judge dangerous to the peace and safety of the United States . . . to depart out of the territory of the United States[.]"))). The City of Boston therefore forecloses federal immigration officials' use

of the Congressionally authorized detention method and directly imposes a different method, with a heightened standard, on the Federal Government for effectuating detentions. But the City of Boston has no such power to prevent federal agents from carrying out their duties "until they satisfy a state officer." *See Leslie Miller*, 352 U.S. at 190; *see also Arizona*, 567 U.S. at 406 (recognizing that "a conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy" (alterations and citation omitted)).

The Boston Trust Act's denial of ICE officials' access to the City of Boston's facilities likewise regulates federal functions. Specifically, as alleged in the Complaint, by barring federal officials "access to aliens in the City of Boston's custody upon their release as provided by federal law," Compl. ¶ 47, the City releases dangerous criminal onto the streets, "where they could reoffend and commit serious crimes," *id*. ¶ 8, forcing federal immigration officers to engage in difficult and dangerous efforts to rearrest aliens who were previously in local custody, *id.* ¶ 47, pursuant to the INA's comity principles, 8 U.S.C. § 1231(a)(4)(A)("the Attorney General may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment. Parole, supervised release, probation, or possibility of arrest or further imprisonment is not a reason to defer removal").

The Boston Trust Act "'requires ICE to entirely transform its approach to' its sovereign function of transporting and removing noncitizen detainees." *See United States v. King County*, 122 F.4th 740, 756 (9th Cir. 2024). "Because this impermissibly override[s] the federal government's decision, pursuant to discretion conferred by Congress," as to how to effectuate detentions and removals, the Boston Trust Act is invalid under the intergovernmental immunity

doctrine's regulation prohibition. *See id.* Thus, the United States has sufficiently pled a claim of unlawful regulation.[2]

Accordingly, Count III withstands dismissal.

### B.    The Complaint States a Claim of Unlawful Discrimination Against the Federal Government.

Count II sufficiently pleads that the Boston Trust Act constitutes unlawful discrimination against the Federal Government. The doctrine of intergovernmental immunity also prohibits state or local laws from discriminating against the Federal Government—or even just a part of it. *See North Dakota v. United States*, 495 U.S. 423, 434–36 (1990). Such laws discriminate against the Federal Government "by singling out the Federal Government for unfavorable treatment." *United States v. Washington*, 596 U.S. 832, 839 (2022). And *any* discriminatory burden on the Federal Government is impermissible. *See Dawson v. Steager*, 586 U.S. 171, 171 (2019).[3] Although state and local laws that innocuously "touch[] on an exclusively federal sphere [are] not enough to establish discrimination," *McHenry Cnty.*, 44 F.4th at 594, such laws that uniquely *burden* federal

---

[2] The Boston Trust Act is also invalid under intergovernmental immunity principles because it prevents immigration officers from fully executing their duties under the INA. *See CoreCivic, Inc.*, 145 F.4th at 327 (finding that a state law "directly regulates the federal government by substantially interfering with a core federal function"); *see also Pub. Utils. Comm'n of State of Cal. v. United States*, 355 U.S. 534, 543 (1958) (holding that a law barring federal officials from exercising their "discretion" to hire shipping contractors without state approval violates intergovernmental immunity where the restriction would have delayed shipments, seriously hampering the military missions they served); *Leslie Miller, Inc.*, 352 U.S. at 190 (explaining that states cannot require federal officers to "desist from performance until they satisfy a state officer"). If such laws were replicated throughout the country, they would "destroy the federal function" of immigration enforcement. *United States v. Fresno Cnty.*, 429 U.S. 452, 463 n.11 (1977). The Framers of our Constitution "did not intend" for federal operations to "depend on the discretion of the state governments." *McCulloch*, 17 U.S. (4 Wheat.) at 327, 362.

[3] The principles of the intergovernmental tax immunity doctrine, in which even nominal discrimination against the Federal Government establishes a violation, also apply to the general intergovernmental immunity doctrine. *See North Dakota*, 495 U.S. at 434–39.

activities violate this nondiscrimination rule. And courts presume that those laws are invalid absent clear congressional authorization for the state regulation. *See Washington*, 596 U.S. at 839; s*ee also King County*, 122 F.4th at 757 (finding unlawful discrimination where a County Order directed local officials to ensure that operators who leased space from the County's airport would not service ICE charter flights).

The Boston Trust Act unlawfully discriminates against the Federal Government by singling out federal immigration enforcement for unfavorable treatment. Compl. ¶ 9. Defendants dispute this. While appearing to concede that the Boston Trust Act might have "some impact on the federal government with respect to immigration enforcement," Defendants posit that such impact "is only because the federal government has sole authority in that area." ECF No. 16 at 16. Defendants further contend that the Federal Government cannot show "differential treatment" necessary for discrimination because "there is no better treated comparator because there is no comparator to federal immigration officers." *Id*. at 17. But Defendants are missing the point. The Boston Trust Act facially targets ICE and only ICE, denying ICE agents access to detainees absent a criminal warrant and prohibiting the exchange of basic information. *See* Bos., Mass., Code ch. 11, §§ 1.9(B), (D)(1)(a)(3)–(4). In other words, the Boston Trust Act applies uniquely to federal immigration enforcement efforts because it is designed solely to frustrate the Federal Government's enforcement of the immigration laws. That plainly offends the Supremacy Clause.

The fact that the Boston Trust Act treats ICE and immigration agents less favorably than the general public and other law enforcement agencies is clear. On its face, the Boston Trust Act prevents the Boston Police from sharing any information that ICE seeks, including release dates and personal information. Bos., Mass., Mun. Code ch. 11, §§ 1.9(B), (D)(1)(a)(3)–(4). No other entity is subject to such restrictions. The Boston Trust Act also facially treats federal immigration

21

agents worse than even other federal law enforcement agents. Compl. ¶¶ 49–50, 58–59. In fact, the Boston Trust Act goes so far as to distinguish the sub-agency ICE-HSI from ICE. *See, e.g.*, *id.* § 1.9(A). These facts are more than sufficient to show that Boston "treats someone else better than it treats [ICE]." *North Dakota*, 495 U.S. at 438 (quoting *Washington v. United States*, 460 U.S. 536, 544 (1983)).

For those reasons, Defendants arguments are unavailing. Defendants contend that their differential treatment of ICE is permissible because the more favorably treated groups are not "similarly situated" to ICE. *See* ECF No. 16 at 16-17 (citing *McHenry County*, 44 F.4th at 594). Because "only" ICE carries out civil immigration enforcement, the argument goes, there is no entity "similarly situated" to ICE, and, absent such a comparator, Defendants are free to discriminate with impunity. Singling out functions that only the Federal Government performs for differential treatment is evidence of discrimination. Defendants assert that "the fact that the Act touches on an exclusively federal sphere is not enough to establish discrimination." ECF No. 16 at 16 (citing *McHenry County*, 44 F.4th at 594). But here, the Boston Trust Act does not merely "touch on" an exclusively federal function. It discriminatorily burdens the United States in carrying out that function specifically because of Boston's disagreement with federal policy.

The "similarly situated" language cannot be read so narrowly as to foreclose membership by others to evade a finding of discrimination. To the contrary, if the only difference justifying the discriminatory treatment is the federal agency's enforcement of a particular federal law, the discrimination is clear. *See King County*, 122 F.4th at 757–58 (rejecting the County's argument that "significant differences" between ICE and others who chartered flights justified the discriminatory treatment of ICE where the difference was ICE's role in carrying out deportations); *United States v. California*, No. 2:18-cv-721-WBS-DB, 2018 WL 5780003, at *6 (E.D. Cal. Nov.

1, 2018) (rejecting California's argument that it could discourage conveyances of federal public lands because those lands, unlike private lands, are preserved for the public's benefit: "This quality of federal public lands, however, is so directly linked to their federal status that it cannot serve as the basis for non-discriminatory differentiation."); *cf. McHenry County*, 44 F.4th at 594 (finding the TRUST Act's prohibition on State and local officials entering into contracts to house immigration detainees in State or local facilities was nondiscriminatory partly because the provision touched on a federal sphere in an innocuous way but did not treat anyone else better than the Federal Government). Here, the Federal Government suffers the "differential treatment" the *McHenry County* Court found lacking because other law enforcement agencies and the public are given access to government facilities, detainees, and information on more favorable terms than ICE. *See, e.g.*, Compl. ¶¶ 49–50, 59.

More fundamentally, the "similarly situated" language must be understood in context. Since *McCulloch*, 17 U.S. (4 Wheat.) at 316, the Supreme Court has held that States may not impose taxes directly on the Federal Government. But States may impose nondiscriminatory taxes that indirectly increase costs for the Federal Government so long as the tax is "imposed equally on the other similarly situated constituents of the State." *United States v. Fresno Cnty.*, 429 U.S. 452, 462 (1977). Underlying this principle is the rationale that taxes imposed solely on federal employees "could be escalated by a State so as to destroy the federal function performed by them[.]" *Id.* at 464 n.11. But if the tax were also imposed on residents and voters of the State, that would provide a political check against abuse of the taxing power and abate the danger to the Federal Government. *Id.*; *cf. Dawson*, 586 U.S. at 171 (holding that a State statute exempting from state taxation the pension benefits of state and local law enforcement officers, but not the federal pension benefits of a retired federal marshal, violates intergovernmental immunity).

In contrast, when the target of the impermissible discrimination is the Federal Government itself, or even just a part of it, the danger is at its peak. *See Washington*, 596 U.S. at 842 (noting the absence of a "ballot-box safeguard" for laws that discriminate solely against the Federal Government); *King County*, 122 F.4th at 757–58 ("[B]urdening federal operations, and *only* federal operations . . . violates the anti-discrimination principle[.]" (citation omitted)); *cf. Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 346 (7th Cir. 2017) (policy that discriminates against some women constitutes prohibited sex discrimination even if it does not affect every woman). Here too, there is no political check on the unlawful discrimination as long as frustrating ICE's enforcement of federal immigration law remains popular with voters of the State. Allowing discrimination of this sort to stand would undercut the Supremacy Clause by enabling states to thwart federal policy so long as only one federal agency implements that policy. *See Washington*, 596 U.S. at 841 (explaining that absent the prohibition on discrimination, nothing prevents a State from imposing unduly high costs on the Federal Government for the benefit of the State's own citizens).

Finally, Defendants argue that invalidating the Boston Trust Act would create a back-end anticommandeering problem. *See* ECF No. 16 at 17–18. Defendants are wrong. At the outset, Defendants cannot seriously contend that actively discriminating against the Federal Government is constitutionally protected inaction. Rather, to the extent Boston chooses to give other law enforcement agencies and members of the public access to information, detainees in their custody, and facilities, the City cannot withhold the same from ICE just because of Defendants' disagreement with federal immigration priorities. *See King County*, 122 F.4th at 758. Just as there is no "threat of unconstitutional commandeering when ICE uses county highways to transport immigration detainees from one place to another just because the county owns its highways," *King County*, 122 F.4th at 758, there is no such threat when ICE accesses detainees upon their release

from Boston custody (including in the public lobbies of state and local facilities) or when ICE accesses information already collected by the Boston Police Department.

The United States therefore has sufficiently pled a claim of discrimination in Count II.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion to Dismiss.

Dated: January 7, 2026                    Respectfully submitted,

                                          BRETT A. SHUMATE
                                          Assistant Attorney General
                                          Civil Division

                                          ALEXANDER K. HAAS
                                          Director
                                          Civil Division, Federal Programs Branch

                                          JACQUELINE COLEMAN SNEAD
                                          Assistant Director
                                          Civil Division, Federal Programs Branch

                                          /s/ *Jordan A. Hulseberg*
                                          JORDAN A. HULSEBERG
                                          JAMES J. WEN
                                          Trial Attorneys,
                                          U.S. Department of Justice
                                          Civil Division, Federal Programs Branch
                                          1100 L Street, N.W.
                                          Washington, D.C. 20005
                                          Telephone: (202) 598-3856
                                          E-mail: jordan.a.hulseberg2@usdoj.gov

                                          *Counsel for Defendants*

<u>**CERTIFICATION OF SERVICE**</u>

I hereby certify that, on January 7, 2026, this memorandum was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ <u>*Jordan A. Hulseberg*</u>
JORDAN A. HULSEBERG
