IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br>v.<br><br>CITY OF BOSTON, *et al.*,<br><br>            Defendants. | Case No. 1:25-cv-12456-LTS<br>Judge Leo T. Sorokin |

**BRIEF FOR FEDERATION FOR AMERICAN IMMIGRATION REFORM
AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF AND IN
OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

Matthew James O'Brien
Federation for American Immigration Reform
25 Massachusetts Ave., NW, Suite 330
Washington, DC 20001
Telephone: (202) 328-7004
Fax: (202) 387-3447
mobrien@fairus.org

Attorney for *Amicus Curiae*
Federation for American Immigration Reform

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* the Federation for American Immigration Reform ("FAIR") is a 501(c)(3) not for profit charitable organization incorporated in the District of Columbia. FAIR has no parent corporation. It does not issue stock.

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Federation for American Immigration Reform (FAIR) is a non-profit 501(c)(3) public interest organization dedicated to informing the public about the effects of both unlawful and lawful immigration, and to defending in court the interests of Americans in limiting overall immigration, enhancing border security, and ending illegal immigration.

FAIR has been involved in more than 100 legal cases since 1980, either as a party or as *amicus curiae*. The decision in this case will likely have an impact on the ability of the executive branch of the federal government to identify and deal efficiently, fairly, and safely with an illegal alien population estimated to exceed 18 million people in the United States. *Amicus* FAIR has direct and vital interests in defending the executive branch's ability to address the current illegal alien crisis.

## SUMMARY OF ARGUMENT

Defendants' sanctuary policies impede and interfere with federal immigration enforcement and were designed to do just that. By creating obstacles to congressional purposes and contrary to an authority clearly delegated to the federal government, the policies violate the Constitution's Supremacy Clause. The City of Boston's laws, executive orders, and related policies prohibit officials from sharing immigration-related information with Immigration and Customs Enforcement (ICE) and other federal immigration agencies. Defendants laws and policies thus choke off cooperation that would otherwise take place and stand as an obstacle to the federal-state cooperation that Congress sought to facilitate. Indeed, the Defendants' sanctuary policies guarantee that illegal and criminal aliens can expect both less effective federal

---

[1] No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than amicus curiae, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

immigration law enforcement and more favorable treatment than in other states or even elsewhere in Massachusetts, making Boston a magnet for illegal and criminal aliens.

The Defendants' sanctuary policies are conflict-impossibility preempted as well, because they require local officials to harbor illegal aliens in violation of federal anti-harboring statutes. When the sanctuary policies bar local officials from arresting certain illegal aliens and prohibit communications with federal officials as permitted and encouraged by federal law, those policies place state and local officials in a bind: obey local law, or obey federal law. It is impossible to obey both. Consequently, this Court should deny Defendants' motion to dismiss.

## ARGUMENT

### Defendants' sanctuary policies are preempted.

Under the Supremacy Clause, U.S. CONST. art. VI, cl. 2, state laws may be preempted by federal law. Preemption may be either express or implied, and implied preemption includes both conflict preemption and field preemption. *See Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376-377 (2015), *citing California v. ARC America Corp.*, 490 U.S. 93 (1989). Conflict preemption is sometimes further broken down into "impossibility" preemption and "obstacle" preemption. *See Arizona v. United States*, 567 U.S. 387, 399-400 (2012) (discussing obstacle and impossibility conflict preemption). A state law, including an immigration-related one, is conflict preempted if it "stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress." *Id.* (quotation omitted). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). As pointed out by the First Circuit, "[p]reemption will be more easily found where states legislate in areas traditionally reserved to the federal government, and in particular where state laws touch on foreign affairs." *National Foreign Trade Council v. Natsios*, 181 F.3d 38, 73 (1st Cir. 1999). The federal

2

government, due in part to its inherent power to "conduct relations with foreign nations," *Arizona*, 567 U.S. at 395, "has broad, undoubted power over the subject of immigration and the status of aliens." *Id.* at 394. Because Defendants' sanctuary policies impinge on the federal government's enforcement of its immigration laws, preemption should be more easily found.

### A. *Defendants' sanctuary policies are conflict-obstacle preempted.*

Underlying the doctrine of obstacle preemption is the necessity of cooperation between state and federal sovereignties for our federal system to function properly. As the Second Circuit has explained:

> A system of dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems for the mutual benefit of each system. The operation of dual sovereigns thus involves mutual dependencies as well as differing political and policy goals. Without the Constitution, each sovereign could, to a degree, hold the other hostage by selectively withholding voluntary cooperation as to a particular program(s). The potential for deadlock thus inheres in dual sovereignties, but the Constitution has resolved that problem in the Supremacy Clause, which bars states from taking actions that frustrate federal laws and regulatory schemes.

*City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) (internal citations omitted) (holding that 8 U.S.C. § 1373 is constitutional).

By design, Defendants' sanctuary policies frustrate the federal Immigration and Nationality Act (INA) in two of its central purposes—not only the obvious purpose that immigration law be enforced, but the federal-state cooperation Congress intended to foster in that enforcement. As the Supreme Court has recognized, "consultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. For example, in passing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, 110 Stat. 3009 (IIRIRA), which includes 8 U.S.C. § 1373, Congress sought unimpeded communication among federal, state, and local governments in sharing immigration

3

status information, as well as unobstructed cooperation in ascertaining the whereabouts of illegal aliens. The Senate Judiciary Committee Report accompanying IIRIRA makes this general purpose clear:

> Effective immigration law enforcement requires a cooperative effort between all levels of government. The acquisition, maintenance, and exchange of immigration related information by State and Local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act.

S. Rep. No. 104-249, at 19-20 (1996), quoted in *City of New York*, 179 F.3d at 32-33. Thus, in drafting § 1373, Congress sought to foster a cooperative effort among local, state, and federal law enforcement in the enforcement of immigration law.

Shortly before enacting IIRIRA, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104-193, 110 Stat. 2105 (PRWORA). Entitled "Communication between State and local government agencies and Immigration and Naturalization Service," section 434 of this law (codified at 8 U.S.C. § 1644), is nearly identical to § 1373. *E.g., City of New York*, 179 F.3d at 31-32. This provision of PRWORA forbids any prohibitions or restrictions on the ability of state or local governments to send to or receive from the federal government information about the immigration status, lawful or unlawful, of an alien in the United States. Going further than the Senate Judiciary Committee Report accompanying IIRIRA, in the Conference Report accompanying PRWORA, Congress made clear its intent in passing § 1644: to bar any restriction on state or local government entities in their communications with the Immigration and Naturalization Service (INS), the predecessor of ICE, including about the whereabouts of illegal aliens, which obviously includes the time of their release from detention:

> This provision is designed to prevent any State or local law, ordinance, executive order, policy, constitutional provision, or decision of any Federal or State court that

4

>prohibits or in any way restricts any communication between State and local officials and the INS. The conferees believe that immigration law enforcement is as high a priority as other aspects of Federal law enforcement, and that illegal aliens do not have the right to remain in the United States undetected and unapprehended.

H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.), quoted in *City of New York*, 179 F.3d at 32.

Another federal statute also has the purpose of fostering cooperation in immigration enforcement. In 8 U.S.C. § 1357(g), Congress made clear that no agreement is needed for state and local officers or employees "to communicate with [federal immigration authorities] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(A). Likewise, Congress has expressly not required any formal agreement for state and local officers or employees to "cooperate with [federal immigration authorities] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(B).

Defendants' sanctuary policies frustrate, and are intended to frustrate, federal enforcement of immigration law. *See, generally*, Boston Trust Act, codified at Bos., Mass., Mun. Code ch. 11, § 1.9 (2019) (prohibiting Boston Police officers from, *inter alia*, asking individuals about their immigration status or sharing information with ICE). By design, the policies keep ICE in the dark about an alien's place of birth, country of origin, place of home and work addresses, place of employment, incarceration status, and other information of the kind contemplated by PRWORA and depended on by ICE to conduct enforcement operations. Because Defendants' sanctuary policies by their own terms mandate noncooperation with federal enforcement of immigration laws, they thwart the congressional purpose of fostering such cooperation.

5

### B. *Defendants' Sanctuary Policies are conflict-impossibility preempted.*

In addition to being obstacle preempted, Defendants' sanctuary policies are "impossibility" preempted because "compliance with both federal and state regulations is a physical impossibility . . . .'" *Arizona*, 567 U.S. at 399 (quotation omitted). Indeed, Defendants' sanctuary policies require local officials to violate the federal criminal anti-harboring statute, section 274(a) of the INA, codified at 8 U.S.C. § 1324, which provides in pertinent part:

> Bringing in and Harboring Certain Aliens
>
> (a) Criminal penalties.—
>
> (1)   (A) Any person who—
> …
> (iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation; . . .
>
> (v) (I) engages in any conspiracy to commit any of the preceding acts, or (II) aids or abets the commission of any of the preceding acts, shall be punished as provided in subparagraph (B).
>
> (B) A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs—
> …
> (ii) in the case of a violation of subparagraph (A)(ii), (iii), (iv), or (v)(II), be fined under title 18, United States Code, imprisoned not more than 5 years, or both . . . .

The INA defines "person" when used in Title II as "an individual or an organization." 8 U.S.C. § 1101(b)(3). "The term 'organization' means, but is not limited to, an organization, corporation, company, partnership, association, trust, foundation or fund; and includes a group of persons, whether or not incorporated, permanently or temporarily associated together with joint action on any subject or subjects." 8 U.S.C. § 1101(a)(28). Thus, § 1324 applies to municipal corporations and unincorporated areas alike, which, under the INA's sweeping definition, are organizations, and thus persons.

6

By preventing local law enforcement officers from providing information or cooperating with ICE requests in the course of enforcing federal immigration laws, Defendants' policies compel such officials to "conceal[], harbor[], or shield[] from detection" aliens in "any place, including any building" (or to attempt to do so) in violation of 8 U.S.C. § 1324(a)(1)(a)(iii). For example, when ICE seeks to arrest or detain an illegal alien in city custody, and city authorities refuse to cooperate, as mandated by Defendants' sanctuary policies, *see, e.g.*, Bos., Mass., Mun. Code ch. 11, § 1.9(D)(1) (prohibiting city law enforcement officers from providing aliens' release dates and times to federal immigration authorities and transferring aliens to the custody of immigration officers without a judicial warrant), those city officials are thereafter "shielding" the alien's presence, and therefore the alien, "from detection." Also, if ICE seeks to detain an illegal alien in a safe location, like a jail, and city officials either bar the immigration officials or otherwise prevent the arrest, as mandated by Defendants' sanctuary policies, they are "conceal[ing]" the alien "in a[] building" at any time the alien is at that address. Even if city officials claim that receiving a Form I-247A (Immigration Detainer Notice of Action form notifying them of an alien's removability)[2] from ICE does not give them the requisite knowledge of an alien's unlawful presence, the form includes a probable cause determination by the U.S. Department of Homeland Security that the alien is removable, thus at the very least making law enforcement's noncompliance in "reckless disregard" of the alien's unlawful presence. *See, e.g.*, Bos., Mass., Mun. Code ch. 11, § 1.9(B) (barring city officials from complying solely with immigration detainers).

---

[2] Sample form available at: https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf.

Accordingly, the Defendants' sanctuary policies compel local law enforcement to violate the federal anti-harboring statute. In doing so, they make obedience to both federal and state law an impossibility, and they are, therefore, conflict preempted. *See Oneok, 575 U.S. at 377; Fidelity Fed. Sav. & Loan Assn. v. De La Cuesta*, 458 U.S. 141, 153 (1982); *Free v. Bland*, 369 U.S. 663, 666 (1962)) ("the relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail.")

## CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss should be denied.

Dated: January 14, 2026

/s/ Matthew J. O'Brien
Matthew James O'Brien
Federation for American Immigration Reform
25 Massachusetts Ave., NW, Suite 330
Washington, DC 20001
Telephone: (202) 328-7004
mobrien@fairus.org

Attorney for *Amicus Curiae*
Federation for American Immigration Reform

**CERTIFICATE OF SERVICE**

      I hereby certify that on January 14, 2026, a true copy of the above document, filed through the CM/ECF system, will be sent electronically to the registered participants of record as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

      /s/ Matthew James O'Brien
Matthew James O'Brien

Attorney for *Amicus Curiae*
Federation for American Immigration Reform